Louis **HAMILTON** et al.

v.

**Moon LANDRIEU, Mayor, et al.**

**Civ. A. No. 69–2443.**

United States District Court,
E. D. Louisiana.

Nov. 17, 1972.

---

Luke J. Fontana, New Orleans, La., for plaintiffs.

Charles C. Foti, Jr., New Orleans, La., for defendants.

ORDER

CHRISTENBERRY, District Judge.

This matter came before the Court on a Rule to Show Cause Why The Special Master's Report Should Not Be Adopted, and a hearing therein was held on November 8, 1972. After hearing, neither plaintiffs nor defendants having introduced any evidence to controvert the Special Master's Report, it is hereby ordered that the Report and Recommendations filed with this court by the Special Master are hereby approved and adopted.

It is hereby ordered, adjudged and decreed that defendants without delay shall immediately implement the following:

1. Defendants shall continue to provide basic medical services and screening physicals under a contract with Charity Hospital. The quantity and quality of medical services shall be at least at the same level now provided under the present contract between the City of New Orleans and Charity Hospital.

2. A new prison hospital-infirmary shall be constructed immediately.

3. Permanent arrangements shall be made to provide adequate security for medical personnel and to facilitate the needs of the medical program, such as by providing drivers and vehicles to transport and supervise inmates who must be taken to Charity Hospital for treatment.

4. A medical aide shall be on the premises at Tulane and Broad Streets during the evening hours when no other medical personnel are present.

5. Arrangements shall be made with Charity Hospital or with the assistance of Charity Hospital to introduce psychiatric and dental care services and a drug abuse program.

6. A permanent year-round recreation program shall be maintained in the prison, such as described in the recreation report prepared by the New Orleans Recreation Department, which has been filed in the record in this case. This program should strive to give each inmate one hour of recreation off the tier at least five days a week.

7. Sufficient security personnel shall be provided so as to enable the recreation program to operate effectively.

8. As soon as the new prison hospital is completed, an indoor recreation area shall be provided in the prison.

9. The management and operation of the prison shall be improved immediately. To this end the City of New Orleans, with the assistance of the Criminal Sheriff, shall create a City Department of Detention and Corrections with authority·over and responsibility for the proper operation of Orleans Parish Prison. This Department immediately shall employ an Executive Director who shall by education, training and prior experience be qualified as a professional penologist. The Executive Director shall have the responsibility and the authority to assure the effective and proper management of the Orleans Parish Prison.

10. No inmate shall be incarcerated in the present main Orleans Parish Prison facility located on Broad Street after March 1, 1975, and defendants are prohibited from using this facility as a place of incarceration following that date, except for A. & O. purposes as provided below.

After March 1, 1975, the present main prison on Broad Street may be used only as an A. & O. unit for admission and orientation for a reasonable period until a new A. & O. facility has been constructed.

No inmate may be confined in the present prison at Broad Street after March 1, 1975, except to undergo A. & O. processing. No such inmate may be incarcerated there for more than 14 days. No more than 100 inmates may

be incarcerated there at the same time. Defendants shall use every reasonable effort to secure the necessary funds and build a new A. & O. unit to replace the present prison, as soon as practicable, after which no inmate may be incarcerated in the Broad Street prison.

11. The inmate population of the main prison at Broad Street shall be limited immediately and without delay to a maximum of no more than 450 inmates, and the inmate population at the First District Annex, should it be re-opened, shall be limited to a maximum of no more than 60 inmates.

12. Practices whereby inmates are assigned to sensitive tasks which may compromise security such as operation of elevators, and tasks which have inmates perform personal services for other inmates, or which give inmates access to records or information about other inmates shall be discontinued.

13. Defendants shall promptly fill all existing vacancies in the security staff and, in addition, there shall be an immediate increase in security personnel as follows:

   3 Prison Officers IV
  11 Prison Officers III
  30 Prison Officers II
  60 Prison Officers I
   6 Matrons

14. The quality of the security personnel overall shall be upgraded both in recruitment standards and training programs in the following respects:

a. The Department of Civil Service shall require all applicants to meet the standards set forth in its job descriptions and adhere to strict examination performance.

b. All employees of the prison shall be civil service qualified.

c. The incremental increases in wages between the positions of Prison Officer I, II, III, and IV are presently insufficient. These shall be increased to give incentives for prison officers of lower rank to seek advancement.

d. A bona fide pre-service training program shall be organized *outside* the prison, and an in-service training program shall be organized as an annual refresher. The Federal Bureau of Prisons Training Materials for Jail Administrators (Lieutenants and up) and Jail Officers (Sergeant and down) shall be part of the training.

e. Recruitment of minority group employees, in all categories, shall be increased.

15. Prison Officers shall be stationed *inside* the dormitories, *inside* the central corridors of the lock-down tiers, and *inside* the "fifth floor roof" facility. This shall be in addition to the present post deployment, which could then be somewhat reduced. This provision shall be effected as soon as there are sufficient trained personnel.

16. A better system of key identification and key control shall be introduced. A master set of duplicate keys shall be stored outside the prison, but available to the locksmith, as needed.

17. Female prisoners being processed through the main prison shall always be supervised by a Matron.

18. Mentally deranged prisoners shall never be unsupervised or unescorted.

19. Elevators of the prison should be operated by employees rather than inmates.

20. All inmates (sentenced and unsentenced) should be clothed in prison uniforms (except when going to court), so that inmates can readily be distinguished from employees and visitors.

21. The quantity and quality of "shakedowns," i. e., searches of inmates, their quarters and examination of the physical plant both interior and exterior shall be increased. These "shakedowns" shall not be intended to harass inmates nor be conducted in a way calculated to harass inmates. These "shakedowns" should be both of the organized variety in which an entire tier is shaken down, and random, such as by stopping individual inmates.

22. The following personnel shall be added to the prison administrative staff:

1 Clerk IV as Chief Clerk

3 Clerks II

2 Steno-clerks for the Associate Wardens

23. The Chief Administrative Officer of the City of New Orleans is charged with the responsibility of installing a new and adequate system of records in the prison. Sufficient equipment and personnel to implement the new system shall be provided.

24. A program of admission and orientation, including classification, and a program of rehabilitation shall be established and maintained in the prison. These programs shall be under the supervision of and conducted by a professional staff which shall include:

An Associate Warden for Rehabilitation.

A Director of Classification (a sociologist with special training in social psychology or social work or a psychologist).

Sociologists or psychologists specifically trained in social work or social psychology and who are otherwise qualified to act as Assistant Classification Officers and also to engage in counseling and rehabilitation.

The practice of using volunteers from the community and the cooperation with community based rehabilitative programs shall be continued and expanded, and more extensive input and assistance from the City's Universities shall be sought.

25. Prisoners awaiting trial shall be effectively separated from the convicted. If possible the prisoners awaiting trial should be housed in a separate building.

26. An education program for inmates shall be developed and maintained. In this respect, the Orleans Parish School Board should be requested to include the prison within an established school district, or create a school district for the prison and develop an education program for inmates.

27. All inmates in the prison, including untried and unsentenced inmates, shall be eligible to participate in rehabilitation programs.

28. The Inmate Council and the Crisis Clinic shall be continued. Efforts shall be made to expand the Crisis Clinic.

29. Funds shall be made available to the Human Relations Commission to hire a "Prison Ombudsman" who would work on behalf of the Commission to investigate complaints made by individual inmates and where complaints are well founded to seek relief from the appropriate officials.

30. The practice in Parish Prison of chaining inmates manifesting symptoms of psychosis shall be stopped immediately. Humane means of restraint must be provided.

31. The inmate rules shall be reviewed and revised. Inmate rules shall be few, general and clear and distributed to each prisoner upon commitment to the prison.

Inmate rule violations that can lead to administrative punishment (as contrasted to those that lead to criminal charges) should be subject to review with some semblance of due process before punishment is administered. A disciplinary committee, including representatives from both security and rehabilitation staffs, should conduct hearings, including the accused and witnesses. Findings should be based on evidence and testimony. Punishment should be according to a published schedule.

The cash in the hands of inmates shall be deposited with the prison authorities and a credit system established that would enable limited (e. g. $2.00) daily purchases from the canteen or "zu zu."

The canteen or "zu zu," its price list, its rate of profit, the audit of its books, its contributions to the inmate welfare fund, and the purchases made from the inmate welfare fund, shall be under the supervision of the Chief Administrative Officer of the City of New Orleans in communication with the prison classi-

fication department and the Inmate Council.

32. Every outstanding health and sanitation violation as noted in New Orleans Department of Health records with respect to the prison kitchen and environs shall be corrected immediately. The expertise of the Department of Health shall be used in developing a schedule of regular, frequent inspections of the kitchen area and all violations of health and sanitation found by the Department shall be corrected immediately.

33. The kitchen staff shall be supplemented by a Cook III as Chef and a Cook II for better coverage.

34. All hot meals shall be delivered to tiers in closed containers to keep the food warm, and the food shall be served as soon as it reaches the tier.

35. A professional nutritionist shall be consulted about the advisability of altering menus and not serving certain foods during the hot summer months.

36. The City of New Orleans shall pay to the Sheriff for the Parish of Orleans the sum of $1.75 per day for each prisoner in the Parish Prison.

37. A system of careful inspection shall be employed to assure that spoiled food is not used in preparing meals and that spoiled food is promptly disposed of in order to eliminate the possibility of accidental use.

38. Arrangements shall be made between Prison officials and the Department of Health to continue on a regular basis an anti-rodent, roach and other vermin program. This program shall be regarded as a continuing program and the Department of Health shall ascertain the needs of the prison in this respect. Thereafter the Department of Health shall regularly monitor the program and its needs, and adjust the program so as to meet the needs of the prison. Prison officials because of their daily presence in the prison and daily contacts with inmates shall assist the Department of Health with reports of visible evidence of vermin presence.

39. The entire prison shall be maintained in a clean and sanitary condition at all times. A system of inmate sanitation details shall be formulated and implemented, whereby according to schedule inmates clean the tiers and all other areas of the prison. If tiers have to be cleaned six times a day to be kept clean, then they should be cleaned six times a day. Sufficient cleaning materials and tools shall be made available for this work. All inmates convicted as well as unconvicted should work on sanitation details, and be encouraged to do so by making available privileges to inmates who cooperate and denying privileges to inmates who refuse to cooperate. The Department of Health shall periodically inspect the prison and determine whether an acceptable level of cleanliness and sanitation is being maintained, and point out deficiencies where they exist. Those deficiencies shall be eliminated immediately.

40. Every existing mattress in Orleans Parish Prison shall be disposed of and new mattresses procured. Mattresses shall be replaced on an annual basis and linen laundered at least once a week.

41. Every incoming inmate shall be issued a freshly laundered uniform upon his admission into the prison. Prior thereto the inmate shall be required to shower and wash with soap. Uniforms shall be laundered at least twice a week. When facilities within the prison, e. g., laundry, break down, uniforms and bed linens shall be sent to private laundry and cleaning establishments under contract for temporary services.

42. Every tier or unit housing inmates in the main prison and the First District Annex, if it is in use, shall be renovated in a manner comparable to the renovation efforts presently taking place. This shall include as a minimum, painting, installation of a new lighting system, put all plumbing in good working order, replacement of broken plumbing fixtures, etc., and other improvements noted below. The present renovation process shall be accelerated.

43. Every local and state agency which has official responsibility for evaluating and enforcing standards designed to protect the safety and health of occupants of buildings, such as the Fire Marshal, New Orleans Fire Department, Department of Safety and Permits, State Department of Health, New Orleans Health Department, etc. shall make an immediate, comprehensive inspection of all buildings which house Parish Prison inmates. These agencies shall supply defendants and this court with reports as to whether there exist in any of these buildings hazards to the safety and health of inmates as evidenced either by violations of applicable code provisions, or where exemption from code standards is provided, by utilizing standards comparable to code requirements had no exemption been provided. In short, where code provisions are applicable violations shall be noted. Where exemption to code provisions is provided, standards comparable to code requirements shall be applied and deviations from those standards noted. Defendants shall then take immediate steps to insure code compliance. Where code compliance is not required defendants shall take immediate steps to effect reasonable compliance with the standards.

44. The prison shall be provided with its own maintenance staff to include at least:

| | |
|---|---|
| 1 Plumber | 1 Plasterer |
| 1 Electrician | 1 Bricklayer |
| 1 Locksmith | 1 Carpenter |
| 1 Tinsmith | 1 Painter |

45. This maintenance team shall be responsible for all general repair work, either preventive or routine. This team shall be assembled immediately so it can coordinate the work of contractors who are now performing specific repair work. Furthermore, the maintenance staff shall devise a continuing maintenance and repair program. Inmates who have skills in the building and construction trades shall be assigned to assist in performing repair and routine maintenance work under the guidance and supervision of the maintenance employees.

46. All plumbing fixtures, toilets, showers, sinks, etc., shall be put and kept in good order. Replacement of inoperative toilets shall be with stainless steel fixtures rather than the ceramic toilets now being used as replacements. Showers shall be cleaned thoroughly, all rust and old paint should be removed, and shower enclosures and floors shall be coated with an epoxy.

47. The sheet metal covers and boarding on the outside of the windows shall be removed, window frames replaced or repaired, window bars reset, clear glass placed in broken windows, and psychiatric screens (stainless steel, 12 Divisions to the inch) shall be installed over all openings.

48. The practice of welding pipe lockers closed shall be discontinued. All pipe lockers shall be accessible to maintenance personnel. Security should be maintained either by means of outside locks combined with internal security screens or plates, or through the use of metal slip panels over the pipe lockers fastened with special bolts which can be loosened only with an electric power tool.

49. The existing communications system throughout the prison shall be superseded by a modern special telephone system (proprietary products) to include provisions for the following functions:

a. Officer reporting (count)
b. Fire alarm (visual reporting)
c. Emergency alarm (phone off hook)
d. Direct dial into P.A. (disorder)
e. Conference calling (emergency)
f. Monitor conversation (security)

A public address system, which is essential in penal institutions, shall be installed. The system should allow for reversal (speakers become microphones) to provide an audible monitoring system for areas not visible to prison officers.

50. In light of the fact that a standard (break glass) fire alarm cannot be used and since heat and smoke detection are important safety considerations, spe-

cial devices shall be installed in return air or ventilation shafts to cover the kitchen, offices and other areas which are closed and unsupervised during the late shift.

51. The lighting system on the tiers shall be modified to allow the amount of light to be reduced during the night, or supplemented by a system of night lights which would be adequate for security but less intrusive in the sleeping areas, in order to allow the main lighting system to be turned off.

52. Necessary movement in the prison shall be evaluated and time schedules and circulation routes shall be devised to provide more systematic usage of circulation routes and greater control over movement.

53. Planning shall begin now for conversion of the main prison into an A. & O. unit and any modification to the existing physical plant shall be evaluated in the context of the ultimate use of the facility.

54. The Special Master shall report to the court within 30 days of this Order whether or not defendants have complied with this Order so that the court may determine whether contempt proceedings should be instituted.