Richard Franklin MILLER et al.,
Plaintiffs-Appellees,

v.

Dale CARSON, Individually and in his capacity as Sheriff of Duval County, Florida, et al., Defendants-Appellants.

No. 75–2739.

United States Court of Appeals,
Fifth Circuit.

Nov. 23, 1977.

Rehearing and Rehearing En Banc
Denied Dec. 27, 1977.

William L. Coalson, Harry L. Shorstein, William Lee Allen, Jacksonville, Fla., Donna H. Stinson, Asst. Atty. Gen., Dept. of Legal Affairs, Civil Division, Robert Shevin, Atty. Gen., Tallahassee, Fla., for defendants-appellants.

William J. Sheppard, Jacksonville, Fla. (Court-Appointed), for plaintiffs-appellees.

Before TUTTLE, WISDOM, and COLEMAN, Circuit Judges.

WISDOM, Circuit Judge:

The threshold question here is whether the district court had jurisdiction over the subject matter of the case. In addition, on appeal the appellants challenge the propriety of certain remedies the district court fashioned to rectify uncivilized conditions in a jail for detainees. Appellants also attack the district court's award of attorney's fees to counsel for the plaintiffs-appellees.

On June 11, 1974, detainees held in the Duval County Jail in Jacksonville, Florida, filed a handwritten *pro se* complaint against Dale Carson, the Sheriff of Duval County, for the purpose of improving conditions in the jail. The district court ruled that the case was properly brought as a class action, and defined the class as all persons "who are presently or in the future will be incarcerated in the Duval County Jail".[1] The district court appointed counsel,

---

1. 401 F.Supp. at 839. The trial court later divided the plaintiff class into three subclasses:

(a) Subclass 1 shall consist of all those inmates, male and female, who are presently or

William J. Sheppard, to represent the *pro se* plaintiffs. Shortly thereafter, Sheppard filed an amended complaint against Sheriff Carson and other local[2] and state[3] officials responsible for the operation of the jail. That complaint alleged violations of the first, fourth, fifth, sixth, eighth, ninth, and fourteenth amendments to the United States Constitution, and violations of 42 U.S.C. §§ 1983, 1985, and 1986, and of certain Florida statutes. The plaintiffs sought declaratory and injunctive relief, damages, and reasonable attorney's fees.

The plaintiffs moved for partial summary judgment as to the local defendants. After three weeks of hearings, the trial court issued a declaratory judgment, supporting findings of fact, and a preliminary injunction.[4] No appeal was ever taken from the judgment, findings, or injunction. On July 17, 1975, the court entered an order substantially incorporating its earlier findings of fact and granting a permanent injunction. 401 F.Supp. 862. The court awarded $45,792 in attorney's fees to Sheppard. 401 F.Supp. 845.

The defendants-appellants have never contested the conclusions of law or findings of fact of the trial court. First, the defendants contend that the trial court lacked jurisdiction to issue the injunction of July 17, 1975. Second, they argue that the trial court abused its discretion in ordering the following remedial measures: contact visitation, daily recreation, a reduction in the prison population to a level below that contemplated in the design and construction of the jail, and the hiring of a permanent ombudsman. Finally, the defendants contend that the court had no power to award attorney's fees and, in the alternative, that the fees awarded were excessive.

We affirm the rulings of the district court with minor modifications: we affirm its holding that an ombudsman be appointed, but conclude that the ombudsman should not hold permanent office at the Duval County Jail; we modify the ruling that the inmates are entitled to outdoor recreation; we find a different basis for a proper award of attorney's fees to counsel for the plaintiffs-appellees.

I.

The Duval County Jail primarily houses persons awaiting trial on criminal charges. A secondary function of the jail is to hold convicted state and federal prisoners awaiting assignment and transfer to other institutions. The jail was built in 1956 as a maximum security facility. It was designed to hold 432 inmates.

At the time this suit was filed, when a person was arrested, brought to the Duval County Jail, and booked, he was first assigned to a "holding cell". The cell's dimensions were eight feet four inches by nine feet nine inches. In that cell he would find a sink and a commode that might or might not be working. He found other

in the future will be incarcerated in the Duval County Jail awaiting trial in the County and Circuit Courts of Duval County, Florida.
(b) Subclass 2 shall consist of all those inmates, male and female, who are presently or in the future will be incarcerated in the Duval County Jail following conviction in the County and Circuit Courts of Duval County, Florida.
(c) Subclass 3 shall include all those federal prisoners who are presently or in the future will be incarcerated in the Duval County Jail awaiting trial in the federal court or awaiting transfer to a federal institution.

2. In the amended complaint, the plaintiffs also sued the members of the City Council of the Consolidated City of Jacksonville, the Deputy Director of Prisons and Jails of the Consolidated City, the Chief of Jails of the Consolidated

City, the Mayor of the Consolidated City, the Executive Director of University Hospital of Jacksonville, and the Chairman of the Hospital Authority of Jacksonville.

3. The state officials named in the amended complaint were the Director of the Division of Corrections, the Director of the Division of Health, and the Secretary of the Department of Health and Rehabilitative Services. A companion case, No. 75-4464, is on appeal by the state officials. The plaintiffs contended that the state officials violated certain provisions of state law. We certified that question to the Florida Supreme Court. 536 F.2d 757.

4. On February 6, 1975, the preliminary injunction was modified by an order and memorandum opinion, reprinted in 392 F.Supp. 515.

inmates of the cell—all members of his own race—sometimes so crowded together that the inmates had to eat their meals while standing because there was not enough room to sit. Although inmates were classified racially, no segregation on any other basis was attempted. First offenders and juveniles were crowded with convicted murderers, drunks, mental cases, homosexuals, and inmates with body lice and contagious diseases. Vomitus, feces, and urine were sometimes on the floor of the cells. At night, inmates slept in their clothes, without bedding of any kind, on benches or on dirty floors. There were no trash cans in the holding cells. Threats and violent attacks by inmates on other inmates were not uncommon in the holding cells, and the plaintiffs' evidence showed that at least one murder and at least one suicide occurred there in 1974.

After a stay of up to eight days in a holding cell, inmates were transferred to larger cells on the upper floors of the jail. There, showers were available, but newly arrived inmates often could not obtain hygienic materials, such as soap, toothbrushes, and shaving gear, for several days. Sanitation in the upstairs cells was poor. The trial court found that all the commodes and sinks in the upstairs cells were filthy. Standing water on the floor of one of the cell blocks caused slips and falls that resulted in serious injuries. Mice and rats were so numerous that inmates passed their idle time trapping these vermin. The ventilation was poor, and lighting was so weak that reading was never possible in some areas. The trial court found that laundry service was inadequate: the inmates themselves washed most of their clothing with hand soap.

Although the jail was designed for 432 inmates, the population sometimes exceeded 600 and was rarely below 100 over the stated maximum. Some inmates slept in cell-block dayrooms on mattresses strewn on the floor because sleeping areas were inadequate. One expert witness described the situation as "almost shoulder-to-shoulder housing". 401 F.Supp. at 873. Overcrowding strained jail personnel and made conditions even more unsanitary.

At the time this suit was filed, the jail did not have rules governing inmate behavior, and punishment was inflicted without a hearing. The district court found that medical facilities were inadequate. A physician was present only one-half day a week, and nurses were available during only one or two of the three daily shifts. The district court found an even greater problem in the procedure to obtain medical help. Inmates had first to obtain the attention of a correctional officer to receive medical help. In the upstairs cells, inmates often signaled by beating trash can lids against the cell walls. Even so, help was not always forthcoming. The district court found that "the inadequacy of the communications system . . . contributed to the deaths of several inmates". 401 F.Supp. at 876.

The food inmates received was cold and nutritionally inadequate. No special diets were available for inmates with special religious or medical requirements; pork was used "in virtually all meals" because prisoners at the County's correctional farm raised hogs. 401 F.Supp. at 885. Inmates were allowed out of the cell blocks for exercise and recreation only two hours a week. The jail's staff was inadequate: at times the only authority present on a floor with 110 inmates was an inmate-trusty. The trial court found that inadequate supervision by guards contributed to "a daily horror show of violence" in the jail, where assaults, attempted suicides, and homosexual rapes were commonplace. 401 F.Supp. at 883. Jail personnel prepared reports on more than 150 occasions of brutality in the first 11 months of 1974. In most of these incidents, the injured inmate received hospitalization or medical care.

The trial court found that visitation of inmates was severely limited:

Visitation privileges at the Duval County Jail were limited to two hours on one day of each week and were confined only to members of an inmate's immediate adult family. Visiting hours still oc-

cur on Saturdays from 12:30 P.M. to 2:30 P.M. and on Sundays from 12:30 P.M. to 2:30 P.M. Visiting facilities still consist of three small scratched and cloudy visiting windows in each cellblock with malfunctioning speaker boxes below. The construction of the windows and speakers is such that there can be no eye contact at the time of the verbal communication. Visitors and inmates alike are required to shout to be heard and the arrangement prevents any privacy or physical contact whatsoever. There appears to be almost no supervision of visiting by jail personnel, undoubtedly resulting in inequities in obtaining a window due to the overcrowded condition.

401 F.Supp. at 884. Pretrial detainees could not meet with prospective witnesses unless the witnesses were relatives. Jail personnel routinely monitored inmates' telephone calls. Attorneys could not visit inmates during meals or in visiting hours or after 9:00 P.M.

■ The trial judge, who had handled several cases involving conditions of confinement in the Florida State Prisons, made this finding: "The totality of circumstances present at the Duval County Jail . . . produced conditions significantly inferior to those existing within the Florida state institutions." 401 F.Supp. at 889. The district court found that the conditions were "worse than those to which many sentenced prisoners are subjected in Florida, even though the majority of the plaintiffs and the sub-

class of pretrial detainees they represent have not been convicted and are not subject to punishment for any crime". The conditions were "severely punitive and effectively punish" detainees "before they have been convicted of any crime". This "constitute[d] punishment which is both cruel and unusual". The lack of access to lawbooks, the restrictions on visiting privileges, and the limitation on telephonic communications deprived the plaintiffs of effective assistance of counsel. There were restrictions on religious freedom. Discipline was administered in an "arbitrary, capricious, and unlawful summary" manner. "[A]rbitrary and capricious limitations" were placed upon access to families and friends. 401 F.Supp. at 839, 840. The trial judge held that these and other conditions violated the plaintiffs' rights under the first, fifth, sixth, eighth, and fourteenth amendments to the Constitution;[5] and under 42 U.S.C. § 1983.

■ Because the appellants do not attack the trial judge's conclusions of law, we need not determine which constitutional amendment is applicable to what misconduct by the prison authorities. We point out, however, that the totality of circumstances demonstrates that the defendants' conduct violated the due process clause of the fourteenth amendment and 42 U.S.C. § 1983. A government may hold a citizen without showing that he has done wrong, but it may not punish him without proof.[6]

---

5. We find that "the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment". *Williams v. Edwards*, 5 Cir. 1977, 547 F.2d 1206, 1211, quoting *Gates v. Collier*, 5 Cir. 1974, 501 F.2d 1291, 1309. *See generally Holt v. Sarver*, E.D.Ark.1970, 309 F.Supp. 362, aff'd, 8 Cir. 1971, 442 F.2d 304; Comment, Confronting the Conditions of Confinement: An Expanded Rule for Courts in Prison Reform. 12 Harv.C.R.C.L.L.Rev. 367 (1977).

6. It seems clear to us that as to unconvicted detainees the defendant's policies and practices violated the due process clause; any punishment of a person presumed innocent is unconstitutional. We agree, however, with the district court, that in the circumstances this case presents it may also be subject to the "totality

of conditions" approach. As the court stated in *Holt v. Sarver*, E.D.Ark., 309 F.Supp. 362, aff'd. 8 Cir. 1971, 442 F.2d 304, "All of those things [the totality of degrading conditions] exist in combination; each affects the other; and taken together they have a cumulative impact on the inmates . . ." The court concluded that "confinement itself within a given institution may amount to cruel and unusual punishment prohibited by the Constitution where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people". *Id.* at 372. Once a court has found that the cumulative effect of interrelated conditions violates the eighth amendment, sweeping remedies may be the appropriate cure. *See* Judge Frank M. Johnson's order in *Pugh v. Locke*, M.D.Ala., 1976, 406 F.Supp. 318, aff'd in substance sub

*Duran v. Elrod,* 7 Cir. 1976, 542 F.2d 998, 999; *Rhem v. Malcolm,* 2 Cir. 1974, 507 F.2d 333, 337. Pretrial detainees "are not to be subjected to any hardship except those absolutely requisite for the purpose of confinement only". *Rhem v. Malcolm,* 507 F.2d at 336–37; *Jones v. Wittenberg,* M.D. Ohio 1971, 323 F.Supp. 93, 100, *aff'd,* 6 Cir. 1972, 456 F.2d 854. The trial judge in *Rhem v. Malcolm,* S.D.N.Y., 371 F.Supp. 594, 622 appropriately quoted Blackstone:

> "Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county gaol . . . there to abide till delivered by due course of law. . . . But this imprisonment, as has been said, is only for safe custody, not for punishment: Therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." 4 Blackstone Commentaries 300. [Ehrlich's Blackstone 901 (1959)].

## II.

■ The plaintiffs contend that the trial court properly exercised jurisdiction under 28 U.S.C. §§ 1343(3) and (4), the jurisdictional analogues to 42 U.S.C. § 1983, and that it properly granted declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.[7] The defendants argue that the trial court had no subject matter jurisdiction over this claim. Their argument runs as follows. There would be no jurisdiction in this case under § 1343 if there were no claim under § 1983. No § 1983 claim can be maintained against a city or a county, because these political subdivisions are not "persons" for the purpose of that section. *City of Kenosha v. Bruno,* 1973, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109; *Moor v. County of Alameda,* 1973, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596. When a 1983

suit is brought to obtain money from the public fisc it cannot be maintained even though the nominal defendants are natural persons. *Muzquiz v. City of San Antonio,* 5 Cir. 1976 (en banc), 528 F.2d 499.

*Muzquiz,* however, does not stand for the proposition that no one can maintain a 1983 suit that is in essence against a governmental body regardless of the relief sought. In *Muzquiz,* the plaintiffs sought, in effect, the transfer of money from a governmental entity to their own pockets. They labeled their action one for an accounting, restitution, and refunds, and sued individual members of the Board of Trustees of the City's pension fund. This Court held that the suit would fail because the relief requested was "tantamount to a money judgment for restitution against the fund". 528 F.2d at 501. *Muzquiz* is distinguishable from the case we face now: the plaintiffs seek no transfer of money to themselves. They do not even seek the expenditure of public funds. They asked the district court only to halt the unconstitutional operation of the Duval County Jail. *Muzquiz* does not bar such relief. In *McGill v. Parsons,* 5 Cir. 1976, 532 F.2d 484, this Court allowed injunctive relief against city officials and stated that such relief did not result in "the kind of monetary burden . . . which we proscribed in *Muzquiz* . . . ." 532 F.2d at 486 n.1.

The instant case is analogous to *Williams v. Edwards,* 5 Cir. 1977, 547 F.2d 1206, in which this Court stated that a district court order to improve the Louisiana State Penitentiary at Angola "does not require the spending of funds. It requires only that if the State of Louisiana continues to operate the Angola prison it must do so within the Constitution and laws of the United States and the State of Louisiana." 547 F.2d at 1212. *Williams* involved the eleventh amendment, but it stands for the principle that enjoining the unconstitutional operation of an institution need not require mon-

*nom Newman v. State of Alabama,* 5 Cir. 1977, 559 F.2d 283.

7. The plaintiffs also alleged that jurisdiction exists because of 28 U.S.C. § 1331. In view of

our holding that there was § 1343 jurisdiction, we need not reach this contention.

etary expenditures; such an injunction is prohibitory, not mandatory.

The officials operating the jail here have two choices: to operate the jail constitutionally, or not to operate it at all. See *Gates v. Collier,* 5 Cir. 1974, 501 F.2d 1291, 1319–20. The trial court correctly exercised jurisdiction here. The plaintiffs' 1983 action was proper: it sought injunctive relief from unconstitutional conditions rather than money damages from a nonperson. To hold that officials in their individual capacities are always nominal rather than real defendants for 1983 purposes would be a long step backward in federal jurisdiction. *Muzquiz* cannot be read to go that far.

### III.

As Judge Coleman stated in *Newman v. State of Alabama,* 5 Cir. 1977, 559 F.2d 283,

Our real issue is whether in striving to attain constitutional objectives the District Court in a few respects went impermissibly beyond the requirements of the federal constitution; more specifically, did the Court supersede the duly constituted state authorities in the performance of vital state functions rather than *compelling* those authorities to perform those functions in a constitutional manner?

Federal courts must be constantly aware of the delicacy of the balance between federal equitable power and state administration of its own law. *Rizzo v. Goode,* 1976, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561. But, to quote again from *Newman,* "Most assuredly, however, in proper cases a federal court can, and must, compel state officials or employees to perform their official duties in

compliance with the Constitution of the United States".

Bearing in mind that about 85 percent[8] of the inmates in the Duval Jail are unconvicted detainees and considering the offensiveness of the prison conditions, we hold that, with minor exceptions, the experienced trial judge fashioned remedies that were within his judicial power and comply with the standards set forth in *Newman* and *Williams v. Edwards,* 5 Cir. 1977, 547 F.2d 1206.

### A. *Contact Visitation.*

"There can be no doubt that the necessity of assuring security must be balanced against the right to humane treatment of prisoners and that if contact visits [visits that permit inmates to touch their visitors] are incompatible with that need they must be sacrificed. The critical question is whether the two can coexist. We are persuaded that they can . . ." So said the court in *Rhem v. Malcolm,* 371 F.Supp. at 605. So said the trial judge in this case. So say we.

We have said that for *convicted* prisoners "visitation privileges are a matter subject to the discretion of prison officials". *McCray v. Sullivan,* 5 Cir. 1975, 509 F.2d 1332, 1334; *see also Newman v. State of Alabama,* 5 Cir. 1977, 559 F.2d 283. We reserved, however, the question whether convicted prisoners have a constitutional right to visitation in some form. *Martin v. Wainwright,* 5 Cir. 1976, 525 F.2d 983, 984 n. 3. Here, the trial judge ordered the defendants to establish a program of "contact visitation"[9] for *pretrial* detainees,

---

**8.** The trial court stated:

The evidence does not show the specific percentage of the inmates of a Duval County Jail who are pre-trial detainees. Although the percentage of pre-trial detainees has been estimated at about 85%, the evidence is uncontroverted that the vast majority of the inmates are in fact pre-trial detainees and that the Duval County Jail was exclusively designed and has always been primarily utilized as a maximum security facility for the detention of pre-trial detainees.

401 F.Supp. at 865–66 n. 2.

**9.** The trial court based its order for a program of "contact visitation" largely on *Rhem v. Malcolm,* S.D.N.Y.1974, 371 F.Supp. 594, 625–26, *aff'd,* 2 Cir. 1974, 507 F.2d 333, 338–39, *opinion after remand,* 2 Cir. 1975, 527 F.2d 1041, 1043. In that case, the order requiring a system of contact visitation did not apply to detainees who were classified as requiring "maximum security custody". 371 F.Supp. at 626. We do not hold that contact visitation is a right for all persons presumed innocent by the law. The defendants' plan may contemplate contact visits for fewer than all pre-trial detainees, but it must relate denials of contact visitation to in-

many of whom will have the charges against them dismissed.

■ The district court pointed out that "the defendants have also failed to present direct evidence of the alleged threats to institutional security". 401 F.Supp. at 895. Nevertheless, the court's adoption of the language of the opinion in *Rhem v. Malcolm* on the subject of security risks strongly points to the Duval jail authorities having discretion to apply different procedures to inmates who represent security risks. Of course, prison authorities are under a duty to adopt reasonable measures to prevent visitors from smuggling weapons or contraband to prisoners, whether the prisoners are convicted or unconvicted and whether they are classified as maximum or minimum security risks.

■ The trial judge was well aware that the program of contact visitation would take time to put into effect. Moreover, he recognized the concern the defendants expressed as to their ability to comply with the court order in light of the structural limitations of the jail. Accordingly, he allowed the defendants a year within which to establish a program of contact visitation. This period seems reasonable to us; on a showing that an extension of time is necessary, the trial judge will be able to decide whether to grant or to deny the extension.

The trial court based its order, as we have noted,[10] on the physical conditions affecting visitation: visits were permitted only for two hours on one day a week; visits were confined to adult members of an inmate's immediate family; facilities consisted of three small scratched and cloudy visiting windows in each cellblock with malfunctioning speaker boxes. Inmates would crowd around these windows without supervision, a situation that resulted in (1) inequitable distribution of the available visiting time, and (2) a total lack of privacy in visitation. Inmates awaiting trial could not prepare their factual defenses, for witness-

es could not visit the jail unless they were family members.[11] The jail officials did not distinguish between pretrial detainees and convicts, or between inmates who constituted security risks and those who did not. By contrast, more than 95 percent of the convicted felons in the Florida State Prison system were allowed eight hours a week of contact visitation with families. 401 F.Supp. at 884.

■ In sum, contact visits, especially to detainees, are an appropriate, humane remedy, within the court's constitutional exercise of its judicial power. *Rhem v. Malcolm*, 2 Cir. 1974, 507 F.2d at 338–39; *O'Bryan v. County of Saginaw*, E.D.Mich. 1977, 437 F.Supp. 582; *Jordan v. Wolke*, E.D.Wisc.1977, 75 F.R.D. 696; *Forts v. Malcolm*, S.D.N.Y.1977, 426 F.Supp. 464; *Mitchell v. Untreiner*, N.D.Fla.1976, 421 F.Supp. 886; *Inmates, D.C. Jail v. Jackson*, D.D.C.1976, 416 F.Supp. 119; *Dillard v. Pitchess*, C.D.Cal.1975, 399 F.Supp. 1225; *see generally* Comment, Confronting the Conditions of Confinement, 12 Harv.C.R.–C. L.L.Rev. 367, 373, 401 (1977); Note, *United States ex rel. Wolfish v. Levi*: The Limits of Administrative Discretion on Inmate Visitation, 3 New England J. Prison L. 291, 300–02 (1976). Moreover, the trial court did not "thrust itself into prison administration", *Bounds v. Smith*, 1977, 430 U.S. 817, 832, 97 S.Ct. 1491, 1500, 52 L.Ed.2d 72, 86. The jail officials, not the trial court, will plan and supervise the contact visits.

### B. *Exercise and Recreation.*

In an earlier case we reserved the question whether the Constitution and 42 U.S.C. § 1983 require that pretrial detainees be allowed opportunities for outdoor exercise and recreation. *Smith v. Sullivan*, 5 Cir. 1977, 553 F.2d 373, 379. In the case now before us, we face that question and the question whether the Constitution and § 1983 mandate such opportunities for convicted prisoners. We hold that both pre-

stitutional security rather than institutional convenience.

10. *See* section I of this opinion.

11. Deposition of Roland W. Grant, Jr., Chief of Jails of the Consolidated City of Jacksonville.

sumably innocent inmates and convicted inmates must be "allowed reasonable recreational facilities". Pretrial detainees are entitled to such facilities because of the due process clause of the fourteenth amendment. For convicted criminals, as we stated in *Newman*, 559 F.2d at 291, "We do this simply because such facilities may play an important role in extirpating the effects of the conditions which undisputedly prevailed in these prisons at the time the District Court entered its order".

We find that the remedy ordered by the district court, daily outdoor recreation, is an appropriate goal toward which jail authorities should work. That goal may not be immediately attainable because of lack of resources. *See Smith v. Sullivan*, 5 Cir. 1977, 553 F.2d 373, 379. Or it may not be invariably attainable because of inclement weather, an outbreak of violence within the jail, or emergency situations. It is, however, a goal toward which the jail authorities should strive.

1. Detainees.

■ The issue of the right of pretrial detainees to outdoor recreation pits the paramount need for jail security against the principle found in the procedural branch of the fourteenth amendment's due process clause that citizens may not be punished without proof. We hold that presumably innocent pretrial detainees who are not classified as security risks and who have not been shown to have violated the disciplinary rules of the jail have a fourteenth amendment and 1983 right to regular access to the outdoors.

■ The reason for which presumably innocent detainees are incarcerated is to assure their attendance at trial. Any incarceration or detention might be deemed punitive, because it is a deprivation of liberty. But pretrial detention only becomes punishment violative of the fourteenth amendment due process clause when the conditions placed on the detainee are more restrictive than are necessary to assure his presence at trial or to preserve security. *Duran v. Elrod*, 7 Cir. 1976, 542 F.2d 998,

999; *Rhem v. Malcolm*, 2 Cir. 1974, 507 F.2d 333, 336–37. "[W]here a person has not been convicted of a crime, any deprivation of his liberty by the state must be the least restrictive means of achieving the purpose of the deprivation." Note, Constitutional Limitations on the Conditions of Pretrial Detention, 79 Yale L.J. 941, 949 (1970), *quoted in Hamilton v. Love*, 1971, E.D.Ark., 328 F.Supp. 1182, 1192.

We agree with the trial court that conditions at the Duval County Jail were unnecessarily restrictive. Presumably innocent detainees were literally stored in a building designed as a maximum security penal institution—a building designed to punish as well as to hold. At the time of the trial of this case, at least 90 percent of the inmates in the jail never left their cellblocks, even for meals. 401 F.Supp. at 893. Inmates presumed innocent by the law were often kept for months in these cellblocks while waiting for trial. The trial court considered the continuous confinement of the inmates at the Duval County Jail and found that such uninterrupted incarceration was unnecessary for the purpose of maintaining their presence at that institution. We agree with that finding. The trial judge also surveyed the areas available for outdoor recreation at the municipal complex of which the jail is a part and found that there were adequate facilities for that purpose without a "large expenditure of funds". 401 F.Supp. at 893. We find that the continuous incarceration of presumably innocent persons in an institution designed to punish, where outdoor recreation is reasonably possible, is unnecessarily restrictive and therefore punishes the innocent in violation of procedural due process. *See Rhem v. Malcolm*, 2 Cir. 1974, 507 F.2d 333; *Duran v. Elrod*, 7 Cir. 1976, 542 F.2d 998, 999; *Haggy v. Solem*, 8 Cir. 1977, 547 F.2d 1363 (per curiam); *Hamilton v. Landrieu*, E.D. La.1972, 351 F.Supp. 549, 550; *Taylor v. Sterrett*, N.D.Tex.1972, 344 F.Supp. 411, 422, *aff'd*, 5 Cir. 1974, 499 F.2d 367, 368; *Brenneman v. Madigan*, N.D.Cal.1972, 343 F.Supp. 128, 140; *Conklin v. Hancock*, D.N.H.1971, 334 F.Supp. 1119, 1122; *Jones*

*v. Wittenberg,* N.D.Ohio 1971, 330 F.Supp. 707, 717, *aff'd,* 6 Cir. 1972, 456 F.2d 854.

### 2. The Convicted Criminals.

[11] We need not reach the question whether convicted criminals have a constitutional right to outdoor exercise.[12] When the totality of conditions in a penal institution violates the Constitution, the trial court's remedies are not limited to the redress of specific constitutional rights. *See Gates v. Collier,* 5 Cir. 1974, 501 F.2d 1291, 1309. In *Newman v. State of Alabama,* 5 Cir. 1977, 559 F.2d 283, at 288, this Court found that "[s]ome of the steps . . . [ordered by District Judge Frank M. Johnson], if considered in isolation, may have gone beyond constitutional mandates but they were justifiably invoked for the eradication of Eighth Amendment conditions." In *Newman,* the district court found that conditions in the Alabama Prison System were "barbaric and inhumane". 406 F.Supp. at 331. It ordered sweeping relief that included the following paragraph about recreation:

> Each institution shall employ a qualified full-time recreation director with at least bachelor's level training, or its equivalent, in recreation or physical education. Adequate equipment and facilities shall be provided to offer recreational opportunities to every inmate. Space shall be available for inmates to engage in hobbies. Suitable vocational programs shall be provided.

406 F.Supp. at 335. On appeal, although we did not approve all the trial court's remedies, we

> affirm[ed] the actions of the District Court designed to provide Alabama prison inmates with reasonable recreational facilities. We [did] this simply because

such facilities may play an important role in extirpating the effects of the conditions which undisputably prevailed in these prisons at the time the District Court entered its order.

559 F.2d at 291.

Conditions in the Duval County Jail were similar to those in the Alabama prisons. In Alabama, "most inmates [had to] spend substantially all of their time crowded in dormitories in absolute idleness". 406 F.Supp. at 326. In the Duval County Jail, as we have noted, over 90 percent of the inmates never left their cellblocks. Moreover, the trial court found from the evidence "that there is an extreme need for recreational facilities in the Duval County Jail". 401 F.Supp. at 881. Given the totality of the circumstances at the Duval County Jail, we find that the district court did not abuse its discretion in ordering the jail authorities to work toward a program of daily outdoor recreation.

### C. *Restriction on Jail Population.*

The defendants contend that the trial court erred in restricting the normal daily population[13] of the Duval County Jail to 410 inmates, when the jail was originally designed to hold 432 inmates in the general population. The district court found, however, that overcrowding at the jail caused constitutional deprivations and that, whatever its original design, the jail provided adequate space for only 410 inmates. 401 F.Supp. at 899. We see no abuse of discretion in this part of the trial court's order.

The district court based its order to limit the population to 410 on the testimony of two experts on prison correction.[14] Profes-

---

12. Although deprivation of exercise per se does not violate the cruel and unusual punishment clause, prisoners are not wholly unprotected; such a deprivation may constitute an impairment of health forbidden under the eighth amendment. *Estelle v. Gamble,* 1976, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251.

13. Under the order, the defendants may allow the prison population to exceed the normal

daily population only in emergency situations, only for 72 hours, and only by 22 inmates.

14. A district court has the power to order an end to the operation of a penal facility (or to condition its continued operation on a reduction in population) when it is so overcrowded as to violate the law. *See Williams v. Edwards,* 5 Cir. 1977, 547 F.2d 1206, 1215.

sor Charles Robert Sarver,[15] for the plaintiffs, concluded that the jail could properly hold 404 inmates. Professor Ellis MacDougall,[16] a witness for the court, concluded that the jail's capacity was around 425.[17] Professor Sarver based his conclusion on the original design capacity of the jail [18] and changes made in the jail after its construction. Some of the space designed for housing inmates had been converted to a law library, an infirmary, offices, and a convalescent unit. What the defendants contend, in effect, is that the trial court should have ignored the changes made in the jail and should have considered only the original design. We find that contention without merit.

■ The defendants also argue that the trial judge should have included the jail's twenty one-person isolation cells in his determination of the design capacity of the jail and should have found that the jail had originally been designed to hold 452 inmates rather than 432.[19] This argument too must

fail. One part of the district court's order that was never appealed specifies that these isolation cells may be used only for disciplinary or medical reasons or upon the written request of an inmate. 392 F.Supp. at 523. We see no error in the trial judge's not considering cells that may be used only in extraordinary circumstances.[20]

### D.  Appointment of an Ombudsman.

■ The trial court ordered "the establishment of a *permanent* ombudsman to act as a middleman between the inmates and the correctional staff". 401 F.Supp. at 898. (Emphasis in original.) He had the good judgment to appoint a Magistrate as ombudsman.

We cannot uphold the *permanency* of the ombudsman, but we find no fault with the trial court's exercise of its discretion in ordering this relief until it relinquishes jurisdiction over this matter.[21]

The appointment of an ombudsman is the kind of procedural innovation we sought to

---

**15.** Professor Sarver teaches at the University of Arkansas; he was formerly Superintendent of the State Penitentiary at Cummins, Arkansas, Commissioner of the Arkansas Department of Corrections, and Director of the Department of Corrections for the State of West Virginia.

**16.** Professor MacDougall teaches at the University of South Carolina; he was formerly Commissioner of Corrections for the State of Georgia, Commissioner of Corrections for the State of Connecticut, and Director of Corrections for the State of South Carolina.

**17.** Professor Sarver testified that, according to currently accepted correctional standards, inmates should have 60 to 80 square feet of living space and that the 35 square feet or so provided in the Duval County Jail were inadequate. Professor MacDougall testified that current correctional standards mandate around 85 square feet of living space per inmate. These correctional standards indicate what experts believe is desirable for rehabilitation rather than what they believe is required as a minimum to avoid cruelty. *See Williams v. Edwards*, 5 Cir. 1977, 547 F.2d 1206, 1215 & n. 8.

**18.** In *Newman v. State of Alabama*, 5 Cir., 1977, 559 F.2d 283 at 288, we approved the use of the design standards of *existing* facilities as a tool for determining constitutional capacity.

**19.** The defendants' argument is weakened by a statement of William L. Coalson, assistant counsel for the defendants: "The 432 number is the permanent beds that were originally installed there and not the overflow beds that we have been talking about." Transcript Volume XIV at 1226.

**20.** We do not mean to intimate that the trial judge was bound by the original design of the building in determining its constitutional capacity. *See Newman v. State of Alabama*, 5 Cir., 1977, No. 76–2269, 559 F.2d 283. We simply find no error in his use of the original design or in his calculations of the jail's present capacity.

**21.** The district court will be able to determine when constitutional violations have ceased to occur routinely. The officials of the jail will achieve constitutional compliance when they furnish the inmates "with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety". *Newman v. State of Alabama*, 5 Cir., 1977, 559 F.2d 283 at 291. *See* Comment, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 57 Va.L. Rev. 841, 856–64 (1971); Comment, Constitutional Limitations on the Conditions of Pre-Trial Detention, 79 Yale L.J. 941 (1970); Comment, Confronting the Conditions of Confinement: An Expanded Role for Courts in Prison Reform, 12 Harv.C.R.–C.L.L.Rev. 367 (1977).

encourage in *Hardwick v. Ault,* 5 Cir. 1975, 517 F.2d 295, where we said:

We, too, are aware of the burdens imposed upon the federal judicial system by the increasing volume of prisoner litigation . . . The federal courts, and particularly the district courts, must make every effort to devise procedural innovations that will readily separate meritorious claims from frivolous claims and that will encourage informal settlements of grievances while at the same time preserving the plaintiffs' rights under 42 U.S.C. § 1983.

517 F.2d at 298. The ombudsman, like the monitor ordered by this Court in *Newman v. State of Alabama,* 5 Cir., 1977, 559 F.2d 283, should observe conditions at the jail and report his observations to the trial court, to assure compliance with the trial court's orders. To that end, he may report inmate complaints to the jail administration,[22] for such reports may lead to the solution of some problems without involving a litigation. *Cf. Newman v. State of Alabama,* 559 F.2d at 289 (informal conferences between monitor and warden may lessen burden on trial court). The ombudsman may also, as the trial court suggested, serve as a channel of communication from the jail administrators to the inmates, if the officials see fit to use him in that way. The ombudsman, however, like the monitor, should have "no authority to intervene in daily prison operations". *Id.* He is to be an arm of the court rather than an independent agent. *See Newman* for a discussion of the duties and powers of an ombudsman/monitor.

The trial court erred in ordering that the ombudsman have permanent office. Court-ordered permanency is an intrusion into state administration of prisons beyond the necessities of the case. We find only one

other disputed [23] case in which a court ordered the use of an ombudsman or monitor without limiting the period such a person should serve. *Hamilton v. Landrieu,* E.D. La.1972, 351 F.Supp. 549, 552, ordered the employment of a "Prison Ombudsman" to investigate complaints and seek relief from the prison's administrators. That case was never appealed. Other cases more appropriately tie the duration of the official position created to the duration of the litigation spawning it.[24] In *Gates v. Collier,* 5 Cir. 1974, 501 F.2d 1291, 1321, the trial court appointed a monitor to determine the degree of compliance with its order. In *Morgan v. McDonough,* 1 Cir. 1976, 540 F.2d 527, 533, the court appointed a temporary receiver for troubled South Boston High School. *Inmates of Attica Correctional Facility v. Rockefeller,* 2 Cir. 1971, 453 F.2d 12, authorized the appointment of federal monitors to implement an injunction against brutality; the "injunction [could] be vacated upon a showing that it [was] no longer required for the protection of the inmates". In *Pugh v. Locke,* M.D.Ala.1976, 406 F.Supp. 318, 331, *modified sub nom Newman v. State of Alabama,* 5 Cir., 1977, 559 F.2d 283, the district court had appointed a thirty-nine-man Human Rights Committee for the Alabama Prison System to monitor compliance with the court's orders; on appeal this Court ordered the dissolution of the committee and the appointment of a monitor. In *Morales v. Turman,* E.D.Tex. 1973, 364 F.Supp. 166, 179 and E.D.Tex. 1974, 383 F.Supp. 53, 120–21, an ombudsman was appointed to report to the court on various matters, including possible violations of the court's orders. In *Alberti v. Sheriff of Harris County,* S.D.Tex.1975, 406 F.Supp. 649, 678, the court held that "There shall be an Office of the Ombudsman established to monitor defendants' efforts in complying with [its] Order."

---

**22.** Prisoners who fear for their own safety may be reluctant to appear to be communicating with authorities directly. *See* Note, Conditions for Confinement for Administratively Segregated Prisoners, 55 N.C.L.Rev. 473, 480 (1977).

**23.** *Cf. Martarella v. Kelley,* S.D.N.Y.1973, 359 F.Supp. 478, 486 (parties agreed to the hiring of an ombudsman).

**24.** The most common forms of judicial officers are the receiver and the master. Receivership is not a permanent state of affairs; after masters find the facts in a cause of action, they vanish. *See* Note, The *Wyatt* Case: Implementation of a Judicial Decree Ordering Institutional Change, 84 Yale L.J. 1338, 1344 n. 23, 1346.

After the district court relinquishes jurisdiction, the administrators of Duval County Jail, of course, may determine whether to use an ombudsman, grievance procedures, or both to attempt to settle prisoners' complaints without litigation. There is strong support for use of an ombudsman;[25] there is no inconsistency in having both an ombudsman and internal grievance procedures.

## IV.

On June 12, 1975, the trial court awarded William J. Sheppard of Jacksonville, Florida, the plaintiffs' attorney, $45,792 in fees for his work in this litigation up to April 30, 1975. The joint and several award is to be "satisfied out of funds allocated to operate the Office of Sheriff of Duval County Florida", or to be recovered from the defendants in their official capacities, or against Sheriff Carson in his individual capacity. 401 F.Supp. at 861–62. The defendants challenge this award in two ways: they contend that it was unauthorized by law, and that even if it was legal, it was excessive. We find that the award was proper in both respects.

### A. *The Civil Rights Attorney's Fees Awards Act of 1976*

We base our holding that the award was authorized on the Civil Rights Attorney's Fees Awards Act of 1976,[26] Pub.L. 94–559, § 2, Oct. 19, 1976, 90 Stat. 2641, codified at 42 U.S.C. § 1988. That Act provides in relevant part: "In any action or proceeding to enforce a provision of sections 1981, 1982,

1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

### 1. Retroactivity of the Act

The defendants-appellants argue that this case does not fit the statute for several reasons. They contend first that the statute should not be applied retroactively. After oral argument in this case, however, this Court resolved that issue in *Rainey v. Jackson State College*, 5 Cir. 1977, 551 F.2d 672, 674, n.2. We held that the Act "is retroactive and applies to cases pending at the time of its enactment [October 19, 1976]".[27] Since this action was pending on October 19, 1976, the Act applies to it.

### 2. Liability of defendants for attorney's fees

The defendants also allege that the trial court had no legal authority to assess attorney's fees against them in their official capacities or against the funds allocated to the Sheriff's Office, because "such an award would expend itself on the public treasury of Jacksonville, Florida". Brief for Defendants-Appellants at 46. We find that the award could properly run against the public treasury of Jacksonville.

First, the legislative history shows that Congress meant to allow awards against governmental units even when the units are

25. *See, e. g., Dreyer v. Jalet*, S.D.Tex.1972, 349 F.Supp. 452, 489–90 (dictum), *aff'd*, 5 Cir. 1973, 479 F.2d 1044 (per curiam); *Paka v. Manson*, D.Conn.1974, 387 F.Supp. 111, 117 (district court found that Corrections Department's ombudsman had enjoyed "considerable success"); authorities cited in *Willis v. Ciccone*, 8 Cir. 1974, 506 F.2d 1011, 1015 n. 4 (ombudsmen and grievance commissions); Prison Ombudsman Provide a Safety Valve, 55 Judicature 314 (1973), cited in *McCray v. Burrell*, D.Md.1973, 367 F.Supp. 1191, 1207, *rev'd*, 4 Cir. 1975, 516 F.2d 357.

26. We affirm the trial court's finding that the plaintiffs are entitled to recover an attorney's fee from Sheriff Dale Carson in his individual capacity on the basis of the bad faith exception

to the general rule that a party must pay his own attorney's fee. *See* 401 F.Supp. at 853–57. The trial court found, among other indicia of bad faith, that Sheriff Carson had visited the jail only twice in 16 months although he had promised a grand jury investigating the jail that he would visit it at least monthly. The trial court could well have found that such behavior prolonged or even caused this litigation.

27. This holding is in agreement with the holdings of the Courts of Appeals of the First and Eighth Circuits. *Martinez Rodriguez v. Jimenez*, 1 Cir. 1977, 551 F.2d 877; *Finney v. Hutto*, 8 Cir. 1977, 548 F.2d 740.

not named parties. The Report of the Senate Committee on the Judiciary on the Civil Rights Attorney's Fees Awards Act, then Senate Bill 2278, stated:

> In several hearings held over a period of years, the Committee has found that fee awards are essential if the Federal statutes to which S. 2278 applies are to be fully enforced. We find that the effects of such fee awards are ancillary and incident to securing compliance with these laws, and that fee awards are an integral part of the remedies necessary to obtain such compliance. Fee awards are therefore provided in cases covered by S. 2278 in accordance with Congress' powers under, inter alia, the Fourteenth Amendment, Section 5. As with cases brought under 20 U.S.C. § 1617, the Emergency School Aid Act of 1972, defendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other item of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (*whether or not the agency or government is a named party*). (Footnotes omitted) (emphasis added).

S.Rep.No.1101, 94th Cong., 2nd Sess. 5 (1976) U.S.Code Cong. & Admin.News 1976, pp. 5908, 5913. After this report was issued, the Senate twice tabled attempts to exempt state and local governments from the operation of the Act by votes of 59–28 and 52–20. 122 Cong.Rec. S16,432, 16,434 (daily ed. Sept. 22, 1976; *id*, S16,567 (daily ed. Sept. 24, 1976); *id*, S16,656, 16,657 (daily ed. Sept. 27, 1976).

The Report of the House of Representatives Committee on the Judiciary on the Act, then House Bill 15460, shows a similar intention to allow the assessment of fees against public treasuries:

> With respect to the awarding of fees to prevailing defendants, it should further be noted that governmental officials are frequently the defendants in cases brought under the statutes covered by H.R. 15460. See, e. g., *Brown v. Board of Education*, [1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873]; *Gautreaux v. Hills*, [1976, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792]; *O'Connor v. Donaldson*, [1975, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396]. Such governmental entities and officials have substantial resources available to them through funds in the common treasury, including the taxes paid by the plaintiffs themselves. Applying the same standard of recovery to such defendants would further widen the gap between citizens and government officials and would exacerbate the inequality of litigating strength. The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities.

H.R.Rep.No.1558, 94th Cong., 2nd Sess. 7 (1976) (footnote omitted).

Second, the defendants argue that *Muzquiz v. City of San Antonio*, 5 Cir. 1976 (en banc), 528 F.2d 499, prevents an award of attorney's fees against a governmental unit because a governmental unit cannot be sued for money damages under 42 U.S.C. § 1983, even indirectly. Although section 1983 provides no cause of action against local governments because they are not "persons" within the meaning of that statute, *Monroe v. Pape*, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, it creates no immunity for them. Congress was free to pass another statute without the restrictive language of § 1983. Because we find that the intention of Congress in passing the 1976 Act was to allow fee awards against local governments, *Muzquiz* and *Monroe* do not control.

Third, this Court has already held that a court may assess attorney's fees under the Act against a state governmental unit, because of the Supreme Court's holding in *Fitzpatrick v. Bitzer*, 1976, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614, that Congress may authorize awards of damages and fees against a state under section 5 of the fourteenth amendment in spite of the eleventh amendment. *Rainey v. Jackson State Col-*

*lege,* 5 Cir. 1977, 551 F.2d 672. We recognize that the state's eleventh amendment immunity is different in nature from the omission of lesser governmental bodies in § 1983. It would be anomalous, however, to hold that while state governments and state entities may be compelled to pay fees under the Act, local governments and their agencies cannot. Although a constitutional amendment was required to limit the eleventh amendment's immunity, 427 U.S. at 456, 96 S.Ct. 2666, only a statutory authorization is necessary to fill the gap in § 1983 and allow the recovery of money from a local government. *See, e. g.,* 20 U.S.C. § 1617, of the Emergency School Aid Act of 1972, construed in *Bradley v. School Board of City of Richmond,* 1974, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (allowing an award of attorney's fees against a municipal entity).

▆ Fourth, the defendants contend that the plaintiffs' attorney may not receive an award because he is court appointed. Pre-Act cases denied attorney's fees to court-appointed counsel. *Dragon v. United States,* 5 Cir. 1969, 414 F.2d 228 (per curiam); *Gardner v. Joyce,* 5 Cir. 1973, 482 F.2d 283 (per curiam). Those cases, however, were based on lack of judicial authority to order attorney's fees. Now that the Act gives trial courts discretion to award attorney's fees we see no reason to discriminate against court-appointed lawyers. *Cf. Armstrong v. O'Connell,* E.D.Wis.1976, 416 F.Supp. 1325, 1342–43 (allowing attorney's fees to appointed counsel under 20 U.S.C. § 1617, the Emergency School Aid Act). *Compare Newman v. Alabama,* 5 Cir. 1975 (en banc), 522 F.2d 71, 74 (per curiam) (court-appointed counsel) *with Gates v. Collier,* 5 Cir. 1975 (en banc), 522 F.2d 81 (per curiam) (no mention of appointment). To allow fees to court-appointed counsel will encourage the vindication of civil rights which is the purpose of the Act, and court-appointed counsel should be no more expensive than hired attorneys. We hold that

court-appointed counsel may be awarded fees under the Act.[28] On remand, the district court should assess additional attorney's fees for services performed after April 30, 1975, including the services performed for this appeal. *See Gates v. Collier,* 5 Cir., 1977, 559 F.2d 241 at 243.

**B. The Amount of the Fee**

▆ We find that the trial court did not abuse its discretion in setting the attorney's fee at $60 an hour for in-court time and $40 an hour for out-of-court time for Sheppard, with $30 an hour for less experienced lawyers working with him. The district court properly based its award on an examination of the factors listed in *Johnson v. Georgia Highway Express, Inc.,* 5 Cir. 1974, 488 F.2d 714. 401 F.Supp. at 857–60. We find no error in its award of fees. *Cf. Brown v. Culpepper,* 5 Cir., 1977, 561 F.2d 1177 (hourly fees of $75 and $65 for two attorneys).

\*　　\*　　\*　　\*　　\*　　\*

The judgment is affirmed in part, modified in part, and remanded for proceedings consistent with this opinion and for such further action as the district court, pending the termination of this litigation, may take for the vindication of the plaintiffs' rights under Section 1983 and the Constitution of the United States.

COLEMAN, Circuit Judge, concurring:

I concur in the foregoing opinion prepared for the Court by Judge Wisdom, except that I would defer decision of the attorneys' fees issue until the Supreme Court decides *Hutto v. Finney,* on which certiorari has been granted [46 L.W. 3256].

---

**28.** The fact that a trial judge appointed an attorney and later awarded him a fee is not relevant to the question whether a trial court has the power to award such a fee, although it

may be relevant to the question whether the judge abused his discretion. At any rate, we find no abuse in this case.