**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Verna Lee WALKER,
Defendant–Appellant.**

**No. 86–5441
Non–Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

March 15, 1988.

Paul A. McKenna, Miami, Fla., for defendant-appellant.

Leon B. Kellner, U.S. Atty., Linda Collins Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before HATCHETT, ANDERSON and CLARK, Circuit Judges.

PER CURIAM:

This is an appeal from a conditional plea of guilty. Initially, appellant Verna Lee Walker, Sr. was convicted by a jury of conspiracy to import marijuana, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) (1982), and conspiracy to possess marijuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) (1982). Walker was sentenced on one count to twenty months incarceration and on the other a three-year probation period to run consecutive to the twenty months. After Walker was convicted, it came to light that throughout most of the period during which his case was pending, he was, unbeknownst to his trial counsel, cooperating with the government and providing information concerning not only other individuals, but, to some extent, *himself.* Based upon evidence submitted at a hearing which will be outlined, the district court granted Walker's motion for a new trial but denied his motion to dismiss the indictment. His guilty plea was conditioned on his right to appeal from that denial. He asserts that because his cooperation with the government stemmed from unconstitutional and unethical interference with his relationship with counsel, the district court erred in refusing to dismiss the indictment. We affirm.

The government misconduct alleged in this case began in the months prior to Walker's June 30, 1983 indictment. During that period, Walker's nephew, Ben Walker, had become a confidential informant for the government. Supp. Record, Vol. 2 at 103. Ben worked primarily for Tom Storrar, a deputy sheriff of Collier County who was also working as an agent for the federal Drug Enforcement Administration (DEA) Task Force. *Id.* at 100. During Ben's interviews with Storrar, Walker's name came up, and Ben told Storrar that he would try to get his uncle to cooperate. *Id.,* Vol. 3 at 15; *id.,* Vol. 2 at 105. Storrar did not object. *Id.* at 106.

After Walker's indictment, sometime in late July, 1983, Ben visited Walker at home. Ben started their conversation by asking about Walker's case. When Walker responded that he had a good attorney, so it looked as if things would go well, Ben disagreed. *Id.* at 31; *id.,* Vol. 3 at 16. Ben then made it clear that he had been working with the government as a confidential informant and that Walker was facing additional indictments if he did not cooperate. *Id.,* Vol. 2 at 15–16; *id.,* Vol. 3 at 16. Ben also implied that Walker should be wary of the attorney he had retained, Michael Tarkoff, because Tarkoff had other clients who would kill Walker if they found out he was working with the government. *Id.,* Vol. 2 at 15. At that time, however, Walker was not yet cooperating.

Two months later, in September 1983, Walker received a phone call from his attorney. Tarkoff related that Assistant United States Attorney William Norris had called him and asserted that "it was on the streets" that Walker wanted to cooperate. *Id.* at 20. Walker lied and denied the allegation, and Tarkoff said he would pass that information on to Norris. *Id.*

On the same day as the phone call, Ben visited Walker again. This time, Walker was less optimistic, telling Ben, "I don't think nobody can help me get out of this mess." *Id.* at 17–18. Ben again encouraged Walker to cooperate and volunteered to take him to Storrar. *Id.* at 18. After insisting that he wanted his lawyer to know nothing about it, Walker agreed. *Id.* at 19.

The meeting between Walker, Ben, Storrar, and a Detective Paul Kennedy took place in a van in the parking lot of the Marco Island Marriott Hotel. *Id.* at 107. The accounts of what took place differ somewhat. According to Walker, when Storrar learned that Walker did not want his attorney to know about any coopera-

tion, Storrar said Walker had two options: he could either (1) fire Tarkoff and the government would get a public defender to represent him, or (2) continue through to trial with Tarkoff, cooperating all the while, and the government would inform the court of his help at the sentencing. *Id.* at 22; *see also id.*, Vol. 3 at 17. Walker did admit that Storrar never told him not to talk with Tarkoff, but he also claimed that Storrar asked him who hired Tarkoff and how much Tarkoff was paid. *Id.*, Vol. 2 at 23. At the end of the meeting, Walker testified, Storrar asked him to call every time his neighbor's trailer came and went, because the DEA believed it was involved in smuggling activities. *Id.* at 24. According to Storrar, when he learned that Walker did not want his attorney to know, he declined to discuss specifics, *id.* at 109–10, and it was not until Walker later called him that Walker began surveillance on the trailer.[1] *Id.* at 114.

In any event, Storrar contacted neither Walker's attorney nor anyone in the United States Attorney's office about Walker's desire to cooperate. He did pass the information on to Robert Grant, another DEA agent. In turn, Grant informed the Assistant U.S. Attorney. *Id.* at 116. A decision was made to permit Walker's cooperation in spite of his attorney's ignorance. *Id.*

Accordingly, in the months prior to his trial, Walker reported on the trailer's movements and, on one occasion, placed a transmission device on his neighbor's boat so that the agents could determine its location. *Id.* at 24–25. Walker also informed the agents that another suspected smuggler had approached him about renting his boat, and with their approval, he rented it. *Id.* at 25–26. Before doing so, he allowed the agents to place a transmitter on board. *Id.* at 29. In the course of this cooperation, Walker claims, he told the agents about any smuggling activity he knew about. *Id.* at 32.

In the meantime, attorney Tarkoff was preparing Walker's case. Initially, Tarkoff planned an entrapment defense. However, after Walker discussed his prior, possibly criminal activities with Tarkoff and expressed his reluctance to be cross-examined about them, Tarkoff advised him that he should forego an entrapment defense. According to Walker, Tarkoff made the "final decision" not to pursue the defense. *Id.* at 41, 68.

Walker was convicted by the jury on both counts. The trial transcript was not made part of the record on appeal. The Assistant United States Attorney asserted in argument to the district court that no evidence derived from Walker's cooperation was used at his trial, *see id.*, Vol. 3 at 44–45, and Walker has not indicated any evidence that he deems derivative.[2] Walker does complain, however, that his relationship with Tarkoff was irrevocably damaged. Tarkoff executed an affidavit stating that after he asked Walker about the rumors of his cooperation, Walker became less willing to consult with him in preparation of the case. Record, Vol. 2, Tab 185 at 11.

Soon after the trial, Walker fired Tarkoff and appeared before the court in a closed hearing to request appointment of a public defender to help him come to a cooperation agreement with the government. Supp. Record, Vol. 2 at 56–57. The court granted the request, and Walker's current counsel began work on the agreement. In the course of that work, however, counsel

---

1. The defense subpoenaed Ben Walker, but he failed to appear. Ben's version of the events was provided by a law clerk who had witnessed defense counsel's interview with him. The government did not object to the law clerk's testimony, and the court admitted the testimony on its belief that the Federal Rules of Evidence did not apply in the hearing of a post-trial motion.

2. Walker's own testimony at the post-trial hearing indicates that one of the items used to convict him was a taped conversation in which

Walker discussed with an undercover agent two drug transactions. Because the trial transcript is not before us, we cannot verify that the tape was made prior to the misconduct alleged here, but we assume that it must have been because Walker has not argued that it was derivative evidence that prejudiced his case. We note that appellants bear the responsibility of ensuring that the record is complete, and Walker has given us no reason to believe he was unable to do so.

learned that Walker had been cooperating all along. Feeling that the arrangement had been improper, counsel filed a motion to dismiss the indictment or, in the alternative, for a new trial. *See id.* at 34. After an evidentiary hearing at which the facts cited here emerged, the district court granted Walker a new trial. Walker then entered a plea of guilty conditioned on the outcome of this appeal.

Walker contends that the government, acting through his nephew Ben and agent Storrar, interfered with his relationship with counsel in violation of the Sixth Amendment to such an extent that the indictment should have been dismissed. Recognizing that this court has rarely, if ever, found dismissal an appropriate sanction, he argues that this case presents circumstances far more egregious than those in *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), and thus warrants the drastic sanction. We disagree for two reasons.

First, assuming that Walker has made out a Sixth Amendment violation, he has been unable to show that a new trial with new counsel would not rectify the wrong. In *Morrison,* government agents met with the defendant in the absence of her attorney, disparaged the attorney and threatened her with a stiffer sentence if she did not cooperate. The Court assumed that this violated the Sixth Amendment but unanimously reversed because the court below had applied a per se rule of dismissal. The proper approach, the Court held, was "to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." 449 U.S. at 365, 101 S.Ct. at 668.

■ It is true that the interference here was greater than that in *Morrison,* for in *Morrison,* the defendant reported directly and immediately to her attorney about the government's conduct and did not say anything incriminating. Even so, *Morrison* requires that a defendant point to specific ways in which his trial was compromised. *See id.* at 365, 101 S.Ct. at 668 (requiring a showing of "demonstrable prejudice, or

substantial threat thereof"); *see also United States v. Killian,* 639 F.2d 206, 210 (5th Cir.Unit A Mar.1981) (no prejudice shown where statements obtained without counsel were not used at trial), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981). Walker has not done so. He claims that his knowledge that his statements might be used prevented his assertion of an entrapment defense. Walker has not, however, set forth any facts tending to indicate he might have had such a defense. *Cf. United States v. Cross,* 638 F.2d 1375, 1379 n. 2 (5th Cir.Unit A Mar. 1981) ("We cannot conclude that [defendant's] inchoate fear of the introduction of the polygraph test was prejudicial to his defense" where he failed to seek order excluding it), *modified on other grounds,* 655 F.2d 50 (5th Cir.Unit A Sept.1981). Moreover, the record reveals that his attorney made the decision not to pursue an entrapment defense based on prior criminal activity that Walker had told him about, and thus it made no difference that Walker had also told Storrar. That the government was able to introduce at trial an incriminating conversation with an undercover agent taped *prior* to the government's misconduct supports this conclusion. Walker's inability to put on an entrapment defense was not, under these circumstances, prejudicial.

In essence, Walker contends that we adopt a rule that interference with the attorney-client relationship *to this extent* calls for sanctions regardless of the fact that no specific prejudice may be identifiable. The Supreme Court's decisions do offer some support for such a holding. For although *Morrison* required a showing of "demonstrable prejudice, or [a] substantial threat thereof," 449 U.S. at 366, 101 S.Ct. at 668, it can be argued that causing a complete breakdown of communication between a defendant and his attorney, which was not the case in *Morrison,* constitutes a constructive denial of counsel. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court recognized that actual or constructive denial of counsel's assistance, as well as "various kinds of state interference with coun-

sel's assistance," call for prejudice to be presumed. *Id.* at 692, 104 S.Ct. at 2067.

However, even if we were to deem this a constructive denial of counsel—and we refrain from so deciding—we cannot ignore the mandate of *Morrison* that the relief must be tailored to the wrong. If, indeed, Walker's relationship with counsel was irrevocably damaged by the government's conduct, he should have been given—and was—a new trial with new counsel. Wholly apart from considerations of prejudice at the first trial, Walker has not shown why the problems with his first counsel would follow through to his current one.

█ The second reason that dismissal was unwarranted in Walker's case is that there is a distinct possibility that the government did not cause the deterioration of his attorney-client relationship. Although Walker's testimony at one point indicated that Ben had induced Walker's fear of being candid with his attorney, his testimony at other points indicated that he was already fearful and that Ben merely concurred that his fear was reasonable. Thus, the district court could reasonably find that the interference was not as egregious as it was purported to be and tailor the relief granted accordingly.

This is not to say that the conduct the government admits was proper. We note, for example, that the Supreme Court has recently held that no waiver of the right to have counsel present during interrogation can be valid once a defendant has asserted his general right to counsel at an arraignment or similar proceeding. *See Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986). We hold simply that the district court's grant of a new trial was the appropriate remedy. Walker's conviction is AFFIRMED.