PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
12/31/98
THOMAS K. KAHN
CLERK

No. 94-7158

D. C. Docket Nos. CV 92-A-865-N
CV-92-A-869-N

DONALD WILSON,

Plaintiff-Appellant,

versus

BLANKENSHIP, Warden of Montgomery City Jail,
MISS HALL, Assistant Warden, employee of
Montgomery City Jail,
MR. PARKS, Employee of Montgomery City Jail,
MRS. HAWKENS, Employee of Montgomery City Jail,
JANICE HOPKINS,
PAM HARDING, U.S. Marshal,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Alabama

**(December 31, 1998)**

Before ANDERSON and BIRCH, Circuit Judges, and COHILL*, Senior District
Judge.

* Honorable Maurice B. Cohill, Jr., Senior U.S. District Judge for the Western
District of Pennsylvania, sitting by designation.

BIRCH, Circuit Judge:

In this appeal from consolidated actions under 42 U.S.C. § 1983 and <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999 (1971), we determine whether a federal pretrial detainee was subjected to unconstitutional  conditions of imprisonment in a city jail.  The district court granted summary judgment to the federal marshal, the wardens, and the correctional officers.  We affirm because we conclude that all of the defendants-appellees are entitled to qualified immunity.

## I. BACKGROUND

On September 12, 1991, plaintiff-appellant, Donald Wilson, was arrested by drug enforcement agents in Fort Lauderdale, Florida, for a narcotics violation on a warrant issued by the federal district court in the Middle District of Alabama.  A magistrate judge in Fort Lauderdale ordered Wilson removed from the Southern District of Florida to the Middle District of Alabama.  Because there is no federal detention facility in the Middle District of Alabama,

individuals awaiting trial or sentencing on federal charges are housed in municipal and county jails in the district pursuant to intergovernmental agreements, or contracts, with the United States Marshals Service ("Marshals Service"). One such jail used by the Marshals Service to house federal detainees is the Montgomery City Jail ("MCJ") in Montgomery, Alabama.

Defendant-appellee Pam Harding, a criminal investigator for the Marshals Service stationed in Montgomery, transported Wilson from the Northern District of Georgia to MCJ pending his trial and moved him on other occasions for court proceedings. Wilson was housed at MCJ from October 1, 1991, until December 17, 1991, when he was moved to Dothan City Jail to await sentencing.[1] Wilson presently is incarcerated in at the Federal Correctional Institution in Raybrook, New York.

---

[1] Wilson returned briefly to MCJ in February, 1992, prior to transportation to his designated federal correctional institution to serve his sentence.

In his consolidated actions under § 1983 and Bivens, Wilson sought compensatory and punitive damages[2] for alleged constitutional violations during his stay at MCJ. He contended that the absence of a law library at MCJ allegedly caused him to plead guilty to his then-pending federal charge and prevented him from litigating pro se a related forfeiture case as well as this civil rights case. He also alleged that he suffered unconstitutional confinement conditions at MCJ, including overcrowding, disciplinary confinement, and lack of exercise, which allegedly caused him stress, weight gain, and high blood pressure. Defendants-appellees are L.M. Blankenship, MCJ warden at the relevant time; Sharon Hall, assistant MCJ warden at the relevant time; Janice Hopkins[3] and Rafael Parks,[4] correctional officers; and Harding. All of these defendants-appellees pled qualified immunity as an

---

[2] Wilson sued defendants-appellants jointly and severally for $500,000 compensatory damages and $900,000 punitive damages.

[3] Although Wilson appears to have sued both "Mrs. Hawkens" and "Janice Hopkins," the record clarifies that this is one correctional officer and that her correct name is Janice H. Hopkins. See R1-14, Hopkins Affidavit at 1.

[4] The record shows that defendant-appellee "Mr. Park" is correctional officer Rafael Parks, Sr. See R1-14, Parks Affidavit at 1.

affirmative defense.[5]  The district court treated the ordered special reports by Harding, Blankenship, Hall, Hopkins, and Parks as motions for summary judgment.  Wilson moved for summary judgment and requested a jury trial.

Following an evidentiary hearing, the magistrate judge recommended that summary judgment be entered for all defendants.  The district judge adopted the recommendation of the magistrate judge, denied Wilson's motion for summary judgment and request for a jury trial, and granted summary judgment in favor of all the defendants.  On appeal, Wilson pursues his contentions of unconstitutional confinement conditions at MCJ.

---

[5] Although Wilson's original complaint states that he sued the state defendants in both their individual and official capacities, the record and course of proceedings indicate that he sued these defendants only in their individual capacities.  See Colvin v. McDougall, 62 F.3d 1316, 1317 (11th Cir. 1995) (stating that the complaint and course of proceedings determines whether civil rights defendants are sued in individual or official capacities).  In suing for monetary damages solely, Wilson named the individual defendants and described their involvement in his alleged constitutional deprivations. Moreover, none of the defendants pled Eleventh Amendment, sovereign immunity, which would relate to suit in their official capacities, and all pled the affirmative defense of qualified immunity from suit in their individual capacities.

## II. ANALYSIS

We review <u>de novo</u> a district judge's grant of summary judgment. <u>See</u> <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1581 (11th Cir. 1995). When "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(c). Because of the similarity in the causes of action, a <u>Bivens</u> case challenges the constitutionality of federal officials' conduct, while § 1983 challenges the constitutionality of state officials' conduct, we "generally apply § 1983 law to <u>Bivens</u> cases." <u>Abella v. Rubino</u>, 63 F.3d 1063, 1065 (11th Cir. 1995) (per curiam).

Qualified immunity protects government officials from civil trials and liability when their conduct in performing discretionary functions "violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Lassiter v. Alabama A & M Univ., Bd. of Trustees</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)). The district judge did not grant

summary judgment to the government defendants based on qualified immunity; the magistrate judge did not mention this entitlement in his recommendation. Nevertheless, qualified immunity, pled by all of the government defendants as an affirmative defense, should have been the analysis used to grant them summary judgment on the facts in this case.

Our circuit applies a two-part test to determine if the qualified immunity defense protects a defendant government official. See Evans v. Hightower, 117 F.3d 1318, 1320 (11th Cir. 1997). First, the "defendant government official must prove that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." Id. Second, if the defendant official meets his burden, then the plaintiff must "demonstrate that the defendant violated clearly established law based upon objective standards." Id. General propositions and abstractions do not qualify for bright line, clearly established law. See Lassiter, 28 F.3d at 1150. "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question

about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Id. By applying these principles, we determine the entitlement of the marshal, the wardens, and the correctional officers to qualified immunity.

A. Marshal

The only evidence in the record that connects Harding to Wilson is her transportation of him to MCJ and to court proceedings when he was a federal pretrial detainee.[6] Our court has determined that marshals' transporting of federal pretrial detainees is within the scope of their discretionary authority. See Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994). At the time that Harding transported Wilson,

however, no clearly established law would have informed a reasonable government official that transporting a federal pretrial

---

[6] To the extent Wilson suggests that knowledge of the United States Marshals annual inspection report on MCJ should be imputed to Harding, we find this speculation to be supported by neither the facts nor the law. Even if she were aware of the inspection report, there is no evidence whatsoever that Harding had any control over the operation of MCJ and the confinement conditions there.

8

detainee to a local jail with which the Marshals Service had an intergovernmental agreement was unconstitutional. See id. at 1566-67. Accordingly, Harding was entitled to summary judgment based on qualified immunity.

B. Wardens

Blankenship and Hall respectively were warden and assistant warden at MCJ while Wilson was there. Although the scope of their responsibilities encompassed the daily administration of MCJ, Wilson does not complain about the order, cleanliness, or food at MCJ, aspects of the daily functioning of a jail. Instead, his contentions involve space: the lack of a law library and space for exercise. There is no evidence in the record that Blankenship and Hall had control over these aspects of MCJ.

Federal pretrial detainees were housed at MCJ pursuant to an intergovernmental agreement between the City of Montgomery and the Marshals Service, which paid a daily fee for federal detainees housed there. A contracting officer for the Marshals Service and the local police chief executed the intergovernmental agreement

effective at the time that Wilson was housed at MCJ.  That agreement provided that MCJ would house thirty-two federal detainees a day at the request of the Marshals Service.[7]  No mention is made of space or square footage per federal inmate or of outdoor or indoor exercise.  Neither Blankenship nor Hall was a party to this intergovernmental agreement; they implemented its terms for the local government.  Furthermore, the special report filed at the request of the magistrate judge on behalf of the wardens and correctional officers at MCJ states: "The United States Marshals Service is fully aware that [MCJ] has no area for outdoor exercise and has no law library.  The United States Marshals Service and the Federal Board of Corrections inspect [MCJ] once every three (3) months."  R1-14-2.

---

[7] Concerning housing federal detainees at MCJ, the intergovernmental agreement in effect at the time that Wilson was housed there provided:

> The LOCAL GOVERNMENT agrees to accept and provide detention space and services for thirty-two (32) Federal prisoners, (which includes 16 male and 12 female Federal prisoners . . .) in USMS custody, each day upon the request of the U.S. Marshal at the Montgomery City Jail for a period of fifteen (15) years . . . .

R1-17, Exh. A, Intergovernmental Agreement (Oct. 1, 1991) at 4. During the time that Wilson was confined at MCJ, the two MCJ cellblocks used for federal prisoners were filled to capacity and housed 16 inmates in four, four-person cells.

Providing a law library and stocking it as well as building a larger space to house federal detainees necessarily would involve the appropriation of funds. There is no evidence in the record that Blankenship or Hall had any responsibility for or ability to cause such appropriation.[8] See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1194 (11th Cir. 1994) (stating that "[t]he critical determination for imposing liability under section 1983 is ascertaining the particular official with 'final policymaking authority'" (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2723 (1989)). Additionally, creating a law library out of the existing space would exacerbate the other problem about which Wilson complains: insufficient space for exercise.

---

[8] The funds for building or improving local jails come from the local government and usually involve taxing the citizens. See Moore v. Morgan, 922 F.2d 1553, 1556-57 (11th Cir. 1991) (local sheriff approached county commission to propose a referendum to decide if citizens would incur a tax for a new jail to remedy the overcrowding problem at the existing jail); Hamm v. DeKalb County, 774 F.2d 1567, 1569 (11th Cir. 1985) (county provides the funding for the local jail and participates in establishing the general operational procedures, while the jail is supervised by the sheriff and county commissioners who set the general operational policies and are responsible for jail conditions).

Therefore, the record shows that the discretionary responsibilities of Blankenship and Hall with respect to federal detainees consisted of daily administering MCJ pursuant to the intergovernmental agreement between the Marshals Service and the local government and the local regulations of that facility. There is no evidence that they did not do this or that they had any ability to operate MCJ outside this circumscribed zone of discretionary authority regarding federal detainees housed at MCJ. Even if these space concerns were within the scope of their discretionary duties, we still conclude that Blankenship and Hall are protected by qualified immunity because failure to provide a law library for the federal detainees housed there or specific square footage for inmates to exercise violates no clearly established law for qualified immunity purposes, as we clarify.

1. Denial of Access to Courts

It is undisputed that there was no law library in MCJ and no access to a law library when Wilson was detained there.[9] He contends that this deprivation prevented him from filing his civil rights case while he was at MCJ as well as defending his civil rights case. Wilson's sworn testimony at the evidentiary hearing, however, failed to establish that he was concerned with any legal matter other than his criminal case, for which he was represented by counsel. Therefore, the magistrate judge concluded that Wilson suffered no prejudice from his lack of access to the courts while at MCJ.

"[T]he fundamental constitutional right of access to the courts requires prison authorities to . . . provid[e] prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498 (1977). The Supreme Court, however, has clarified that prisoners' contentions of deprivations of access to courts must show actual

_____

[9] Inmates could keep legal materials in their cells and receive attorney calls and visits. Each unit had a dayroom with a telephone that inmates could use to contact attorneys for legal assistance or materials.

13

injury as a "constitutional prerequisite." Lewis v. Casey, 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996); see Weaver v. Brenner, 40 F.3d 527, 533 (2d Cir. 1994) (recognizing that, when judicial decisions subsequently delineate that a right that generally appeared to exist at the time of the government official's conduct did not actually exist, then "the conduct will not subject the official to liability"). While Bounds guarantees the right of access to the courts under the Fourteenth Amendment, prisoners have no inherent or independent right of access to a law library or to legal assistance. See Lewis, 518 U.S. at 349-51, 116 S.Ct. at 2179-80. Instead, they must show actual injury in the pursuit of specific types of nonfrivolous cases: direct or collateral attacks on sentences and challenges to conditions of confinement.[10] Id. at 355-57, 116 S.Ct. at 2182. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Id. at 355, 116 S.Ct. at 2182.

---

[10] In Lewis, examples of actual injury regarding prospective or existing litigation were missing filing deadlines or being prevented from presenting claims. See Lewis, 518 U.S. at 348, 116 S.Ct. at 2178.

14

With respect to access-to-court claims, <u>Lewis</u> clarifies that a plaintiff first must show actual injury before seeking relief under <u>Bounds</u>. <u>See</u> <u>Bass v. Singletary</u>, 143 F.3d 1442, 1444 (11th Cir. 1998). This essential standing requirement means that actions by prison officials that allegedly violated an inmate's right of access to the courts must have impeded the inmate's pursuit of a nonfrivolous, post-conviction claim or civil rights action. <u>See</u> <u>id.</u> at 1445. To prevail, a plaintiff must provide evidence of such deterrence, such as a denial or dismissal of a direct appeal, habeas petition, or civil rights case that results from actions of prison officials. <u>See</u> <u>id.</u> at 1446. Therefore, in an access-to-courts claim, "a plaintiff cannot merely allege a denial of access to a law library or adequate attorney, even if the denial is systemic." <u>Sabers v. Delano</u>, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam). Rather, a plaintiff must demonstrate that the lack of a law library or inadequate access to counsel hindered his "efforts to proceed with a legal claim in a criminal appeal, postconviction matter, or civil rights action seeking to vindicate basic constitutional rights." <u>Id.</u>

In this case, Wilson asserts that the lack of a law library at MCJ prevented him from pursuing these civil rights claims and his civil forfeiture case. Aside from the magistrate judge's determination that Wilson was involved solely with his criminal case while at MCJ, we find Wilson's contentions to be meritless. Because Wilson did litigate his § 1983 and Bivens cases in district court and on appeal, he cannot demonstrate that the prison officials prevented him from pursuing these causes of action. See Bass, 143 F.3d at 1446. Additionally, Wilson's forfeiture case is not a type of case that is included under the right of inmates' access to courts under Lewis, which limits that right to direct or collateral appeals and civil rights cases. See Lewis, 518 U.S. at 355, 116 S.Ct. at 2182. The Supreme Court has reiterated that an in rem forfeiture action constitutes a civil remedial sanction, which is not a classification of case recognized as included in the access-to-courts right under Lewis. See United States v. Ursery, 518 U.S. 267, 277-78, 116 S.Ct. 2135, 2142 (1996). Therefore, Wilson has failed to show actual legal injury regarding either his criminal

conviction, because he was represented by counsel in that matter, or his civil rights litigation, evidenced by this appeal, and <u>Lewis</u> and <u>Ursery</u> mandate that he has no standing for a denial of an access-to-courts claim based on any injury regarding his civil forfeiture case. Thus, even if they had discretionary authority to provide a law library at MCJ, Blankenship and Hall did not violate Wilson's constitutional right of access to courts.[11]

2. Exercise

Wilson complains that both outdoor and indoor exercise were unavailable to him while he was housed at MCJ. It is undisputed that MCJ has no space or provision for outdoor exercise for its inmates. Additionally, Wilson contends that he was unable to exercise inside MCJ because of the lack of space resulting from the number of inmates there.

In contrast to a sentenced prisoner, whose conditions of confinement are analyzed under the Cruel and Unusual

---

[11] We further note that MCJ "has built a new law library for prisoners since this appeal was filed," which Wilson's appellate counsel acknowledges could render this issue "moot." Appellant's Supplemental Brief at 9.

Punishment Clause of the Eighth Amendment, "the proper inquiry

[for a pretrial detainee] is whether [confinement] conditions amount

to punishment of the [unadjudicated] detainee" under the Due

Process Clause of the Fourteenth Amendment.  Bell v. Wolfish, 441

U.S. 520, 535 & n.16, 99 S.Ct. 1861, 1872 & n.16 (1979); see

Villarreal v. Woodham, 113 F.3d 202, 207 (11th Cir. 1997)

(recognizing that confinement of pretrial detainees is a "necessary

restriction" to ensure their presence in court).

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. . . . And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

Bell, 441 U.S. at 537, 99 S.Ct. at 1873.  In analyzing confinement

conditions about which a pretrial detainee complains, a court must

decide whether the detention officials intentionally imposed the

restriction for a punitive purpose or whether it is reasonably

incidental to a legitimate government objective.  See id. at 538-39,

99 S.Ct. at 1873-74; see Villarreal, 113 F.3d at 207.  "If  a

18

restriction is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court may infer that the purpose of the government action is punishment." Lynch v. Baxley, 744 F.2d 1452, 1463 (11th Cir. 1984). Additionally, our court evaluates particular pretrial detainee complaints against the totality of confinement conditions to determine if there is constitutional deficiency. See Hamm v. DeKalb County, 774 F.2d 1567, 1575-76 (11th Cir. 1985).

As we have explained, there is no evidence in this record to show that Blankenship or Hall had any authority or ability to create a secure space at MCJ for outdoor exercise for inmates. Principally, this is because the local government is responsible for appropriating the funds for building such jail outdoor exercise space. Under the analysis prescribed by Bell, there is no evidence whatsoever in the record that Wilson or any other inmate at MCJ was denied outdoor exercise by Blankenship or Hall as punishment. Instead, these wardens were implementing the legitimate government purpose of housing federal detainees

19

pursuant the terms of the intergovernmental agreement between the Marshals Service and the local government. The Court's decision in Bell considered the relatively short stay of federal pretrial detainees at a facility such as MCJ. See Bell, 441 U.S. at 543, 99 S.Ct. at 1876. Following Bell, the former Fifth Circuit accorded no relief at a similar institution housing federal pretrial detainees where "[t]here was no outdoor exercise."[12] Jones v. Diamond, 636 F.2d 1364, 1374 (5th Cir. Jan. 1981) (en banc). We conclude that not only does the record fail to show that Blankenship and Hall, as wardens at MCJ, had discretionary authority to provide outdoor exercise for Wilson or that the lack of such exercise was to

---

[12] In a case that predated Bell, we are cognizant that the former Fifth Circuit found that pretrial detainees should not be incarcerated continuously "in an institution designed to punish, where outdoor recreation is reasonably possible." Miller v. Carson, 563 F.2d 741, 750 (5th Cir. 1977). Rather than mandating immediate outdoor recreation, however, the Miller court recognized that such outdoor exercise "may not be immediately attainable because of lack of resources" and stated that this was "a goal toward which the jail authorities should strive." Id. Thus, Miller did not require that every pretrial detainee have an automatic constitutional right to outdoor exercise, and continuous incarceration is distinct from brief detention periods. We further note that the defendants in Miller were the county sheriff as well as city and state officials charged with oversight of the prison system and appropriation of local and state funds for building prisons and improvements to existing prisons and not the warden, who is charged with the daily administration of the prison. See id. at 744 & nn. 2 & 3. Furthermore, because it predated Bell, which instructs that courts must analyze confinement conditions of pretrial detainees to determine if the intent is to punish or if the condition is incidental to a legitimate government purpose, Miller was not considered under Bell, which directs our review in this case.

punish him, but also that no clearly established constitutional law required that Wilson have immediate access to outdoor exercise during the time that he was at MCJ, where no such facilities existed, and his confinement at MCJ was brief.

Wilson also complains that he was unable to exercise inside MCJ in the limited space available to him. Hall's affidavit explains that Wilson and other inmates were released from their cells into a larger, open area, or dayroom, containing a telephone and television for inmates' use, at 5:00 A.M. and that they remained there until 10:00 P.M., when they returned to their cells for the night. See R1-14, Hall Affidavit at 1-2. This open area "provides space where the inmates may participate in exercises such as push-ups, sit-ups and limited jogging, etc."[13] Id. at 2; see Jones, 636 F.2d at 1373 (noting that there was limited room for indoor exercise and that inmates did push-ups "as their only form of

---

[13] A Marshals Service inspection report states "there is ample room in the day room areas for inmates to do exercises." Government Exh. 1-7. Additionally, federal detainees, like other inmates housed at MCJ, also engage in indoor work detail, which involves sweeping, mopping, and scrubbing their cells, the common areas, and hallways that they occupy on a daily basis. See R1-14, Exh. B at 10 (MCJ Standard Minimum Rules and Regulations). We note that these activities provide some exercise.

exercise in the jammed cells and day rooms"). Wilson states that the dayroom consisted of approximately 240 square feet of floor space, which he shared with fifteen inmates, affording approximately fifteen square feet of floor space per man. See R1-35-1; id. App. B, Wilson Affidavit at 1. He further represents that "even if it would be feas[i]ble to ex[er]cise in this area, it would only annoy the individuals using the phone, and obstruct the others['] v[ie]w of T.V. and could easily escalate into violent physical confrontations," R1-35-1, and that "[t]his area was sever[e]ly over cro[w]ded under the Federal Regulations," id. App. B, Wilson Affidavit at 1.

Despite Wilson's contentions of overcrowding, we note that he does not represent that there were more than sixteen inmates in the dayroom, which was the maximum number specified in the intergovernmental agreement between the Marshals Service and the local government. Furthermore, we have not granted relief for more crowded conditions than Wilson experienced at MCJ in a facility that housed both pretrial detainees and convicted prisoners.

See, e.g., Hamm, 774 F.2d at 1569 ("During Hamm's incarceration there, the jail's population at times exceeded the facility's design capacity.").  In Bell, the Supreme Court clarified that the relative brevity of pretrial detainees' confinement allows spacial confinement that involves "genuine privations and hardship," which might be questionable under the Due Process Clause if they continued "over an extended period of time."  Bell, 441 U.S. at 542, 99 S.Ct. at 1876.  The Court also stated that  federal court decisions concerning minimum inmate space requirements as well as purported standards recommended by various groups with expertise in correctional institutions may set goals, but that "they simply do not establish the constitutional minima."[14]  Id. at 543 n.27, 99 S.Ct. at 1876 n.27.  Recognizing the Bell mandate, "we set no space standards," Jones, 636 F.2d at 1376, in a similar institution where the dayroom sometimes afforded "little more than six square

_____

[14] Even "recommendations of the Federal Corrections  Policy Task Force of the Department of Justice regarding conditions of confinement for pretrial detainees are not determininative of the requirements of the Constitution."  Bell, 441 U.S. at 543 n.27,  99 S.Ct. at 1876 n.27 (emphasis added).  Consequently, the Marshals Service MCJ inspection report, relevant to the time that Wilson was at MCJ, does not show a constitutional violation when it notes that the dayroom was not in compliance with 35 square feet per inmate recommended by the Marshals Service.  See Government Exh. 2 at 2.

23

feet per inmate." Id. at 1374.  Our court  further has concluded that "[i]t is equally clear that the due process clause does not purport to regulate the general conditions and quality of life in the country's jails, and that the courts should not attempt  to make 'judgment calls' to determine which of various marginally different conditions might be more appropriate."  Hamm, 774 F.2d at 1573.

Rather than complaining that fifteen square feet per inmate is insufficient space to do exercises such as push-ups, sit-ups, or jogging in place, Wilson speculates that such exercises may annoy the other inmates with the potential for physical confrontations. There is no evidence in this record that any altercation occurred as a result of Wilson's attempted indoor exercising during his stay at MCJ.  Thus, Wilson has presented no documented reason that he could not have engaged in indoor exercises while he was at MCJ, and he has not shown that Blankenship or Hall prevented him from doing so for a punitive purpose.  To the extent that Wilson represents that he developed high blood pressure because of the lack of an ability to exercise at MCJ, his medical history, attached to

the special report filed on behalf of the wardens and correctional officers, shows that he was suffering from high blood pressure when he entered MCJ.  His medical records while at MCJ further evidence that he received medication and was treated for his ailments while there.  Thus, Wilson's high blood pressure was not caused by his detention at MCJ and his alleged inability to exercise there.

In addition to having no discretionary authority to fund and to build an secure outdoor exercise facility at MCJ or to deviate from the specifications of the intergovernmental agreement between the Marshals Service and the local government as to the number of federal detainees housed at MCJ with the resulting implications for inmate space there, Blankenship and Hall violated no clearly established law in not providing Wilson outdoor exercise while he was at MCJ or affording him more space for indoor exercise. Applying the Bell standard to confinement conditions, such as space, is "exceedingly difficult and does not provide clear results," which  makes qualified immunity appropriate.  Hamm, 774 F.2d at

1573. Moreover, states, not wardens, "can improve the quality and quantity"of such conditions by "increasing and properly administering the amount of money they spend on a detention facility"; "courts in most instances may not interfere with a state's decision to provide detainees with a reasonable level and quality of food, living space, and medical care." Id.   Additionally, under a totality of confinement conditions analysis, Wilson's complaints are few in comparison to  other cases where we have not given relief because we determined that the confinement conditions were not constitutional violations.  See, e.g., id. at 1569-70 (noting that objectionable confinement conditions at county jail included overcrowding, sleeping on tables or the floor, unsanitary floor and linens, occasional foreign objects in the food).   On the facts of this case, Blankenship and Hall are entitled to qualified immunity.[15]

---

[15] We note that our decision would be the same under an Eighth Amendment analysis applicable to the brief time that Wilson returned to MCJ after his conviction and before he was moved to his designated federal penitentiary to serve his sentence.  Our court has held that the minimum standard of the Due Process Clause relative to basic necessities, such as living space, "is the same as that allowed by the eighth amendment for convicted persons." Hamm, 774 F.2d at 1574.  "The Supreme Court . . . has not set forth a standard for determining what level of necessities the due process clause absolutely requires." Id.  Consequently, in addition to having no ability to create exercise space at MCJ as part of their discretionary responsibilities, Blakenship and Hall violated no clearly established law under the Eighth Amendment with

## C. Correctional Officers

Wilson contends that correctional officers Parks and Hopkins also denied him access to a law library and exercise as well as placed him in disciplinary isolation without proper bedding. There is no evidence in the record that Parks or Hopkins had any discretionary authority regarding implementing policies or procedures at MCJ; consequently, they were not responsible for the lack of a law library or exercise space at MCJ. As we additionally have discussed, the lack of a law library, outdoor exercise, or more space for indoor exercise did not violate clearly established law as to Wilson's constitutional rights while he was at MCJ. Accordingly, Parks and Hopkins are entitled to qualified immunity concerning these issues. We limit our analysis to Wilson's complaints concerning his disciplinary isolation.

Wilson represents that, on two separate occasions, Parks and Hopkins each placed him in disciplinary isolation as sanctions for

---

respect to Wilson during the time that he was at MCJ, which also would entitle them to qualified immunity.

his misconduct.[16]  See R1-35, App. B, Wilson Affidavit at 1. He further states that he "was forced to sleep on a bare floor, which was both degrading and inhumane." Id. at 1.  The magistrate judge ordered Hopkins to respond to Wilson's allegations.  Hopkins explained that she placed Wilson in an isolation cell because he was inciting other inmates to disobey an order to lower the noise in their cellblock and that it was her professional opinion that he had to be removed to maintain security in the cellblock.  See R1-39, Hopkins Affidavit at 1-2.  She further avers that MCJ inmates who remain in isolation are given bedding and that Wilson was not required to sleep on the floor.  Id.  In a report describing the incident to Warden Hall, Hopkins states that Wilson was not calm when her shift terminated and that it was the responsibility of the next shift to provide bedding for inmates who remained in isolation after lock down and lights out.  See R1-38, Exh. A.  Even accepting

---

[16] Wilson has not placed in the record the specifics of his alleged disciplinary isolation by Parks.  Because Wilson "bear[s] the responsibility of ensuring that the record is complete," and he "has given us no reason to believe he was unable to do so," we are unable to address his allegations relating to Parks.  United States v. Walker, 839 F.2d 1483, 1485 n.2 (11th Cir. 1988) (per curiam).  Therefore, Parks is entitled to qualified immunity because  we will not hold a government official personally liable for compensatory and punitive damages based on mere allegations.  See Lassiter, 28 F.3d at 1149-50.

28

Wilson's account that he was not provided bedding in the isolation cell, the correctional officer on duty at lock down and lights out would be the individual who allegedly deprived Wilson of bedding and not Hopkins. Additionally, it is unclear from the record whether Wilson actually spent the night or several hours in the isolation cell. We also are mindful that our court has not found an inmate's sleeping on a table while in confinement, but not isolation, not to be violative of any constitutional rights. See Hamm, 774 F.2d at 1569.

Significantly, Wilson was placed in disciplinary isolation to quell a disturbance that he was causing on the cellblock at night. "[P]reserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell, 441 U.S. at 546, 99 S.Ct. at 1878; see Hamm, 774 F.2d at 1573 ("Legitimate restraints may stem from the state's need to manage the detention facility and maintain security."). Prison officials have "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal

order and discipline and to maintain institutional security." Bell, 441

U.S. at 547, 99 S.Ct. at 1878.  Because courts are not in a position

to evaluate urgent problems that occur in prison administration, we

do not second-guess prison officials on matters that they are better

equipped to handle under the exigencies of an internal disturbance.

See id. at 531, 99  S.Ct. at 1870.  Wilson's temporary placement in

disciplinary isolation for the legitimate purpose of quieting him on

the facts of this record was not unconstitutional even without

bedding and did not violate any clearly established law at the

relevant time.  Accordingly, we conclude that Parks and  Hopkins

are entitled to qualified immunity concerning Wilson's placement in

disciplinary isolation.[17]

### III. CONCLUSION

In this Bivens and § 1983 case, Wilson has alleged that a

federal marshal, MCJ wardens and correctional officers violated his

---

[17] To the extent that Wilson suggests that he was deprived of  due process because he was confined in disciplinary isolation without a hearing, "the Due Process Clause does not directly protect an inmate from changes in the conditions of his confinement." Chandler v. Baird, 926 F.2d 1057, 1060 (11th Cir. 1991).  Specifically, the Due Process Clause does not establish "'an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters.'" Id. (quoting  Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 869 (1983)).

constitutional rights as to access to courts, exercise, and

disciplinary isolation.  As we have explained, all of these

defendants-appellants are entitled to qualified immunity.  On this

basis, the grant of summary judgment to defendants-appellants is

AFFIRMED.